[No. A091903. First Dist., Div. Three. May 31, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
LAWRENCE ANTHONY CUEVAS, Defendant and Appellant.

**COUNSEL**

Victoria H. Stafford, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, René A. Chacón and Bruce Ortega, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

HORNER, J.*—Lawrence Anthony Cuevas was convicted of robbing three banks in Alameda County during the fall of 1997. Because of his lengthy felony criminal record, Cuevas was sentenced under the "Three Strikes" law to a total prison term of 85 years to life. He appeals his conviction and sentence on the following grounds: (1) ineffective assistance of counsel for failure to make a suppression motion; (2) instructional error on the element of "force or fear"; (3) instructional error that had the effect of depriving appellant of his right to jury nullification; and (4) cruel and unusual punishment. We find no error and affirm.

### Procedural Background

In an amended information filed on April 12, 2000, appellant was charged with four counts of robbery in violation of Penal Code[1] section 211.[2] It was further alleged that appellant had suffered four prior felony convictions within the meaning of sections 1170.12 and 667, subdivision (a), and had served one prior prison term within the meaning of section 667, subdivision (b).

A jury found appellant guilty of three counts of robbery (counts 2, 3 and 4), but was unable to reach a verdict as to the fourth (count 1). The court declared a mistrial as to count 1. In a bifurcated proceeding, the jury found the prior conviction allegations to be true.

On June 29, 2000, appellant was sentenced to 85 years to life in prison, comprised of the following: consecutive 25-year-to-life terms for each of the three robberies, two consecutive five-year terms under section 667, subdivision (a), and a concurrent one-year term for the prior prison term served. The court stayed sentence on two prior serious felony convictions that it found had not been brought and tried separately. Appellant timely appealed.

---

*Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1]All statutory references are to the Penal Code.

[2]The amended information also charged appellant with one count of possessing a weapon while in prison in violation of section 4502. On appellant's motion, the trial court severed this count from the remaining charges.

*Facts[3]*

### The Prosecution's Case—Count 2

Count 2 of the amended information alleged that on October 24, 1997, appellant had robbed Rachel Bryan. The evidence presented at trial was as follows: Rachel Bryan testified that on October 24, 1997, she was employed as a teller at Bank of the West on Washington Avenue in San Leandro. About 10:00 a.m., a man walked up to her window and asked if the bank cashed traveler's checks. She responded that it did so for customers only. The man walked away, but returned a few minutes later. She asked him if he wanted to open an account. He responded by handing her a note and telling her to read it. The note said, "This is a robbery. Give me your $100 bills. This is serious." The note had two more lines that she did not read because she was afraid, and assumed that the last lines contained a threat. Bryan opened her drawer and gathered the money, including "bait" money that had previously recorded serial numbers, which the bank kept on file. She also tripped the alarm located under her counter. Bryan handed the man the money, and he left.

Bryan estimated that she had been able to look at the man's face for about four minutes. On December 12, 1997, she viewed a videotape of a live lineup, and identified appellant as the man who had robbed her at the bank. She also identified appellant at his preliminary hearing and at trial. In addition, at trial she identified appellant as the person shown in bank surveillance photos taken on the day of the robbery.

### The Prosecution's Case—Count 3

Count 3 of the amended information alleged that on November 6, 1997, appellant had robbed Mary Moore. Mary Moore testified that she worked as a teller at Bank of the West on Second Street in Livermore. On November 6, 1997, about 10:30 a.m., a man came to her window and told her to give him her $100, $50, $20, $10 and $5 bills. He also showed her a note that said the same thing. At first she thought he was joking, but then she "took a good look at him to see if he seemed to be serious in his intent." She concluded that he looked very determined, and that he was serious. She opened her drawer and gave him some 20's, 10's and 5's. He told her to give him 100's and 50's, and to open her second drawer, where the majority of a teller's money is kept. After she opened the second drawer, the man reached over the counter and grabbed money from it. He stuffed the money in his pockets and fled.

---

[3] We set forth only those facts pertaining to the three robbery charges of which appellant was convicted.

Moore was able to observe the robber's facial features for about 30 seconds. She was unable to identify anyone in a photo lineup shown to her on November 21. However, on December 5, 1997, she attended a live lineup, and identified appellant as the robber. She also identified him at the preliminary hearing and at trial.

*The Prosecution's Case—Count 4*

Count 4 of the amended information alleged that on November 12, 1997, appellant had robbed Angela Andrews. Angela Andrews testified that on November 12, 1997, she was working as a teller at U.S. Bank on Hesperian Avenue in Hayward. About 1:15 p.m. a man came up to her window and showed her a note that said "This is a robbery. Give me the money." She grabbed for the note, but the man pressed down on it, so she was unable to retrieve it. Andrews felt afraid. She turned to her drawer, pressed the alarm, and gave the man some money. He told her to give him the rest, so she turned back to her drawer, hesitating over a packet of money with a tracking device concealed inside, known as a "track-pack." The man said, "Give me that," which she did. He unfolded a small department store bag with handles, put the track-pack inside, and left. Andrews described the robber as Hispanic, in his late thirties, about six feet one inch tall, and wearing a black jacket, flat black hat, black pants and sunglasses.

When the man left the bank the tracking device began emitting an electronic signal that could be tracked by the police. The police were notified and began following the signal, which led them to 1408 Timothy Drive in San Leandro, a house that belonged to appellant's sister, Gina Cuevas (Gina). Once several police units had arrived, appellant was ordered to come out of the house. Appellant told his sister to say that he was not there, but he eventually came out and was apprehended and searched. Inside his wallet police found several bills with serial numbers matching those from U.S. Bank. Appellant was placed inside the police car, where he asked an officer "what was going on." He was told that the police were investigating a robbery, to which he responded: "There's no way I was involved. I've been at home at my sister's house all day . . . . You've got the wrong guy." Appellant was very nervous and fidgety.

Detective Edward Muniz explained to Gina that the police were receiving a tracking signal from inside her house, and asked for permission to search, which she gave. Inside the house the signal led officers to the southeast bedroom, where they found a paper J.C. Penney bag with the tracking device and money inside. They also found a black jacket, a black hat, a black leather cap and black sweat pants. In a closet containing appellant's belongings, police found a hypodermic needle and suspected heroin. In a search

incident to appellant's arrest, the police found $420 in crisp $100 and $20 bills. The next day, the police returned to conduct a further search with Gina's consent. In the spare bedroom they found $2,100 in cash inside a sock.

About 45 minutes after the robbery, officers brought Angela Andrews to the Timothy Street house, where she viewed appellant. She identified him as the person who had robbed her, but observed that he had changed his clothing.

James Freeman, Gina's next-door neighbor, testified that around 1:45 p.m. on November 12, 1997, he saw appellant pull up in a red car in front of Gina's house. Gina came out and talked to him, then they both walked into 1408 Timothy Drive. Appellant was carrying a jacket and a small brown bag. About 10 minutes later, the police arrived and began yelling for appellant to come out.

The police also searched the car appellant had been seen driving 10 minutes before the police arrived at Gina's. Inside, Detective Stan Brandon found a blank pad of paper. He rubbed a pencil on the top sheet, and impressions of lettering showed up. Upon further inspection by a forensic document examiner, it was determined that indentations on the second and third sheets of the pad were the words: "This is a bank robbery. Give me all the money now."

At trial, Angela Andrews identified appellant as the man who robbed her. She also identified the clothing found in the bedroom at Gina's house as similar to that worn by the robber.

*Defense Case*

Appellant testified that he was 33 years old, had grown up in Hayward, and had spent most of his youth in juvenile hall and the California Youth Authority. Around October 1997, appellant was trying to pull his life together after his long incarceration. He was attending Chabot College, "working construction" for his uncle, and seeing a psychiatrist. He testified that he was using drugs in the fall of 1997, and had just finished shooting up heroin when he was arrested. He explained that he had been using heroin since he was nine years old.

Appellant identified the black sweat pants found in Gina's house as his, but did not recognize the jacket. He testified that toward the end of October 1997 he was hospitalized with pneumonia, and that he could not remember where he was on the afternoon of November 6, 1997.

Appellant admitted convictions for burglary in 1986, robbery in 1987 and weapon possession in 1992. He also admitted that he had been convicted for bringing drugs into jail in March of 1999, after his mother brought heroin to him in jail.

## Discussion

### Ineffective Assistance of Counsel

Gina testified that on November 12, 1997, the police asked for permission to search her house only after they had already conducted a search. She further testified that she gave her consent only because one of the officers told her that if she did not, her children would be taken away because she was a methadone user. Appellant contends that if these claims were true, then the search of Gina's residence was illegal, and the evidence found during that search, including the track-pack and the clothing, was subject to suppression. Thus, appellant maintains that his trial counsel was ineffective because she failed to make a motion to suppress the evidence used to convict appellant of count 4.

■ Every criminal defendant is constitutionally entitled to competent legal representation. (*People v. Pope* (1979) 23 Cal.3d 412, 424 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) In order to establish a claim of ineffective assistance of counsel, an appellant must show that the attorney's representation was deficient, in that it fell below an objective standard of reasonableness, and that the appellant was prejudiced by counsel's deficient performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688 [104 S.Ct. 2052, 2064-2065, 80 L.Ed.2d 674]; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 [233 Cal.Rptr. 404, 729 P.2d 839].) When an appellant is unable to establish prejudice, a claim of ineffective assistance of counsel fails, and we need not determine whether the complained of conduct was deficient. (*Strickland v. Washington, supra*, at p. 697 [104 S.Ct. at pp. 2069-2070]; see also *In re Alvernaz* (1992) 2 Cal.4th 924, 945 [8 Cal.Rptr.2d 713, 830 P.2d 747].) To establish prejudice, an appellant must show that but for counsel's assertedly deficient representation it was reasonably probable that the outcome of the proceeding would have been more favorable to the appellant. (*Strickland v. Washington, supra*, at pp. 688, 693-694 [104 S.Ct. at pp. 2064-2065, 2067-2068]; *People v. Ledesma, supra*, at pp. 215-218.)

On the record before us, it is not reasonably probable that appellant would have benefited from a more favorable outcome, even had the clothing and money seized in Gina's house been suppressed. There was copious additional evidence unconnected to the search of the house that tended to

establish appellant's guilt: Angela Andrews, the teller robbed at U.S. Bank, unequivocally identified appellant within an hour after he robbed her. The track-pack signal brought the officers to 1408 Timothy Drive, the house appellant was seen entering while carrying a bag like the one he had at the bank, and from which appellant emerged when the police arrived. When the police searched appellant they found money traceable to U.S. Bank. After his arrest appellant appeared very nervous, and voluntarily told an officer that he had been in the house all day (the officer had not told him that the robbery being investigated had occurred that same day, and a neighbor had observed him arriving at the house soon before the police showed up). Finally, a pad of paper taken from appellant's car revealed impressions of the demand note presented at the bank.

From this overwhelming evidence of appellant's guilt, the jury would surely have found him guilty of count 4 without the evidence contained inside the house. Thus, appellant suffered no prejudice from the fact that no motion to suppress was made, and his claim of ineffective assistance of counsel fails.

*Trial Court's Jury Instruction on "Force or Fear"*

The trial court gave the jury the standard robbery instruction as set forth in CALJIC No. 9.40. It told the jury, in part, that "[e]very person who takes personal property in the possession of another, against the will and from the person or immediate presence of that person, accomplished by means of force or fear and with the specific intent permanently to deprive that person of the property, is guilty of the crime of robbery, in violation of Penal Code section 211. . . . In order to prove this crime, each of the following elements must be proved: . . . [¶] 4) The taking was accomplished either by force or fear."

During deliberations, the jury sent the court a note asking for "a definition of the term 'force' as it applies to P.C. § 211." In response, the court told the jury "[t]here is no formal legal definition of 'force.' As used in the definition of robbery, it has its common, ordinary meaning." When asked if this was sufficient, the foreperson stated: "If that means we get a dictionary definition, I would appreciate it if that were read." Instead, the trial court stated: "The following discussion from an appellate court in this state may be of assistance to you: [¶] Generally, the force by means of which robbery may be committed is either actual or constructive. The former includes all violence inflicted directly on the person robbed. The latter encompasses all means by which the person robbed is put in fear sufficient to suspend the free exercise of will or prevent resistance to the taking. This constructive

force means force, not actual or direct, exerted upon the person robbed by operating upon a fear of injury. Included within the common meaning of 'force' is such threat or display of physical aggression toward a person as reasonably inspires fear of pain, bodily harm or death." Outside the jury's presence, the court indicated to counsel that the passage he had read to the jury was contained in *People v. Wright* (1996) 52 Cal.App.4th 203, 210-211 [59 Cal.Rptr.2d 316].

Appellant contends that the passage from *Wright* incorrectly instructed the jury on the element of fear, because it allowed the jury to evaluate the evidence objectively, rather than applying the correct subjective test to determine whether the victim *actually* was afraid. ■ "In considering a claim of instructional error, 'we ascertain at the threshold what the relevant law provides. We next determine what meaning the charge conveys in this regard.' [Citation.] 'The test is whether there is a "reasonable likelihood that the jury . . . understood the charge" in a manner that violated [the] defendant's rights. [Citations.]' [Citation.] In making this determination, 'we consider the specific language under challenge and, if necessary, the charge in its entirety. [Citation.]' [Citation.]" (*People v. Davison* (1995) 32 Cal.App.4th 206, 212 [38 Cal.Rptr.2d 438] (*Davison*).)

■ Appellant asserts, correctly, that when the prosecution seeks to prove a robbery was committed by means of fear, it must present evidence "from which it can be inferred that the victim *was in fact afraid*, and that such fear allowed the crime to be accomplished." (*People v. Mungia* (1991) 234 Cal.App.3d 1703, 1709, fn. 2 [286 Cal.Rptr. 394], italics added.) Actual fear may be inferred from the circumstances, and need not be testified to explicitly by the victim. (*Davison, supra*, 32 Cal.App.4th at p. 214.)

The question, then, is whether this meaning was conveyed by the instruction given to the jury. Appellant contends that the last sentence in the *Wright* passage conveyed the wrong meaning to the jury by instructing that it need only find that it was objectively reasonable for the victim to feel fear, rather than finding that the victim actually, subjectively felt fear. This final sentence, which stated that " 'force' is 'such threat or display of physical aggression toward a person as *reasonably* inspires fear of pain, bodily harm or death' " (quoting *People v. Wright, supra*, 52 Cal.App.4th at p. 211, italics deleted & added), must be first be considered in light of the entire passage. In that light, we do not find it reasonably likely that the jury misunderstood its charge. (See *Davison, supra*, 32 Cal.App.4th at p. 212.) The passage first explained that constructive force " 'encompasses all . . . means by which the person robbed *is put in fear*' and "means 'force, not actual or direct, exerted upon the person robbed *by operating upon* [a] *fear of injury* . . . .' "

(*People v. Wright, supra,* at p. 210, italics added.) It is clear from these definitions that the relevant inquiry for the jury was the fear actually experienced by the victim, causing her to " 'suspend the free exercise of will.' " (*Ibid.*)

Finally, as noted by respondent, in evaluating the reasonable likelihood that the jury understood its charge in a manner that violated appellant's rights, we may consider the arguments of counsel. (*People v. McPeters* (1992) 2 Cal.4th 1148, 1191 [9 Cal.Rptr.2d 834, 832 P.2d 146]; *People v. Kelly* (1992) 1 Cal.4th 495, 526 [3 Cal.Rptr.2d 677, 822 P.2d 385].) Here, closing arguments by both sides made it clear that the jury was being called on to consider the actual fear experienced by Mary Moore, the only victim who did not explicitly state that she felt afraid in the face of appellant's demands.

The prosecution focused on the evidence from which the jury could infer that Ms. Moore was *actually* afraid when she complied with appellant's demand: "Mary Moore did not testify that she was specifically afraid. What she said was, at first she wasn't looking up and she thought it was a joke from a customer, but she then looked up to see if the man was serious, and she stated that that man had a look on his face that made her know that this was serious, and so she then decided that she better give him the money. [¶] She doesn't have to say the magic words, 'I was afraid.' . . . [H]er testimony alone, is enough to meet that element of fear. Tones of voices can make the element of fear; the look on his face. Her decision that he was serious and she better give up the money is enough."

Likewise, the defense urged the jury to find that Ms. Moore was never *actually* placed in fear by appellant's conduct: "[L]et's talk about the element of fear from Ms. Moore. [¶] She told you herself that she had to look up to see if the person was serious, and because of the tone of his voice, she knew he was serious. She also testified very clearly and very straightforwardly that she was never threatened, she was never touched, there was no indication of any kind of physical threat to her. That's what the definition requires of fear, *that she was in fear that force was going to be used.* That was never an issue." (Italics added.)

In light of the full definition given to the jury, as well as the arguments of counsel emphasizing the issue of Ms. Moore's actual state of mind at the time of the robbery, we conclude that there is no reasonable likelihood the jury understood the charge in a manner that violated appellant's rights.

*Jury Nullification*

Several times during his testimony at trial, and despite admonishments from the court, appellant took it upon himself to interject into his answers

information about his Three Strikes status and his potentially very lengthy sentence. For example, when asked by the prosecutor whether he was depicted in a certain photograph, appellant responded: "No, I can't say that that's me. The reason why, jurors, I can't say it's me . . . is because of the way the three-strikes law was written, I can't sit here and tell you people the facts on what's going on with my situation, but there's more to it." When the court admonished appellant to respond to the questions, he said: "I understand, Your Honor, but this is my life we're talking about. They're talking about putting me away for the rest of my life." Three questions later, appellant was asked how the track-pack and stolen money had ended up in his sister's bedroom. He responded: "Well, apparently it had to get there some way, but once again, I can't discuss this because of the three-strikes law; I can't get into admitting or talking to issues that . . . that are going to send me away for life." The court tried to interrupt, but appellant went on: "I'm being honest, Your Honor. I'm telling the people the truth. They've heard the evidence; now they need to hear the facts. My case is deeper than what the evidence perceives." Then, after both sides were done questioning appellant, the court called the attorneys into the hallway for a sidebar, leaving appellant on the witness stand. While court and counsel were out of the room, appellant addressed the jury: "You know people, my situation is deeper than what they're saying here. It's way deeper. The picture is bigger than this. I hope that all you can take that into consideration."

In its instructions to the jury, the court gave CALJIC No. 17.42: "In your deliberations, do not discuss or consider the subject of penalty or punishment. That subject must not in any way affect your verdict." Also, during deliberations, the jury sent out a note, asking for "clarification from Judge Kurtz as to which portions of the Defendant's so-called 'narrative' testimony can be considered by the jury. [¶] Specifically, we want to know about the testimony volunteered by the Defendant after counsel and his Honor left the bench." The judge responded that he had reviewed the statement in question and told the jury: "That was not in response to any question nor is it relevant to any issue. It does not relate to any element of the offense nor does it relate to the issue of identity as to the commission of the offense. Therefore, that is being stricken and you cannot consider it for any purpose."

■ Appellant contends that the court's instructions to the jury violated his constitutional right to due process and a fair trial, because they prevented the jury from exercising its power of nullification, essential to the jury's role as the "conscience of the community." He maintains that the jury should have been permitted to consider that appellant was a heroin addict facing what, in his view, amounted to life without parole for three "nonviolent"

bank robberies.[4] He claims that, had the jury been allowed to consider the information, it could have chosen to nullify the harsh sentence by finding appellant not guilty.

To the extent that the issue of jury nullification had remained unresolved in California, it has now been firmly settled by our Supreme Court in *People v. Williams* (2001) 25 Cal.4th 441 [106 Cal.Rptr.2d 295, 21 P.3d 1209], which reaffirmed "the basic rule that jurors are required to determine the facts and render a verdict in accordance with the court's instructions on the law." (*Id.* at p. 463.) *Williams* cited with approval *People v. Nichols* (1997) 54 Cal.App.4th 21 [62 Cal.Rptr.2d 433] (*Nichols*), a case in which, as here, the defendant argued that the jury should be informed of his Three Strikes status and potentially lengthy sentence, so that it could decide whether to exercise its power of jury nullification. (*People v. Williams, supra,* at p. 456.)

During deliberations, the jury in *Nichols* sent the judge a note asking whether defendant was subject to the Three Strikes law. In response, the judge told the jury that he could not answer the question, and reminded the jury that it could not discuss or consider the subject of penalty or punishment. (*Nichols, supra,* 54 Cal.App.4th at p. 24.) On appeal, this division rejected the defendant's argument that the court's refusal to inform the jury of his potential punishment deprived the jury of the option of exercising its power of nullification. Noting that the trial court was correct in admonishing the jury that it could not consider the subject of penalty or punishment, and also noting that it was not required to instruct on the jury's power of nullification, we saw "no reason in law or logic why the court would be required to provide the jury with otherwise irrelevant information—such as the likely punishment—simply to encourage the jury to exercise that power." (*Id.* at pp. 24-25; see also *People v. Baca* (1996) 48 Cal.App.4th 1703 [56 Cal.Rptr.2d 445].) Thus, we held in *Nichols* that while a jury has the " ' "undisputed power" ' " to ignore the evidence and the law and to acquit if that is what it chooses to do" the defendant has no right to a nullification instruction, nor to such irrelevant information as might appear to sanction such "lawlessness." (*Nichols, supra,* 54 Cal.App.4th at pp. 24-25.)

As stated by our Supreme Court in *Williams,* "[j]ury nullification raises issues that go to the heart of our constitutional form of government. . . . [¶] . . . [¶] Encouraging a jury to nullify a law it finds unjust or to act as the 'conscience of the community' by disregarding the court's instructions may sound lofty, but such unchecked and unreviewable power can lead to verdicts based upon bigotry and racism. . . . [¶] . . . [¶] Jury nullification is

---

[4]As we discuss in the next section, we disagree with appellant's characterization of his crimes as nonviolent.

contrary to our ideal of equal justice for all and permits both the prosecution's case and the defendant's fate to depend upon the whims of a particular jury, rather than upon the equal application of settled rules of law. . . . A nullifying jury is essentially a lawless jury." (*People v. Williams, supra,* 25 Cal.4th at pp. 461-463, fns. omitted.) The trial court here properly instructed the jury that it should not consider penalty or punishment, and that it should disregard appellant's unsolicited statements, which were clearly aimed at obtaining the jury's sympathy in the hopes that it would choose to act "lawlessly."

*Cruel and Unusual Punishment*

■ Appellant contends that the 85-year-to-life sentence imposed by the trial court for three nonviolent bank robberies constituted cruel and unusual punishment under the federal and state constitutions. He maintains that under state and federal authority, the sentence imposed is disproportionate to his individual culpability. ■ Appellant acknowledges that courts generally analyze three prongs when evaluating whether a given sentence is cruel and unusual: (1) the gravity of the offense and the harshness of the penalty; (2) the sentences imposed on other criminals in the same jurisdiction; and (3) the sentences imposed for the same crime in other jurisdictions. (*Solem v. Helm* (1983) 463 U.S. 277, 290-292 [103 S.Ct. 3001, 3009-3011, 77 L.Ed.2d 637]; see *In re Lynch* (1972) 8 Cal.3d 410, 425-427 [105 Cal.Rptr. 217, 503 P.2d 921] [comparable three-pronged test].) His claim focuses only on the first prong—that is, the nature of the offense and the harshness of the penalty, or as framed by the California Supreme Court, the proportionality of the sentence as applied to the offenses committed by appellant and as applied to him, personally. (*In re Lynch, supra,* at p. 425.)

We focus, then, on the first proportionality prong and decide whether, considering the "nature of the offense and/or the offender," the punishment "is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch, supra,* 8 Cal.3d at pp. 424, 425.) When considering the nature of the offense, we take into account "the totality of the circumstances surrounding the commission of the offense in the case at bar, including such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his acts." (*People v. Dillon* (1983) 34 Cal.3d 441, 479 [194 Cal.Rptr. 390, 668 P.2d 697].) In addition, we consider appellant's "individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (*Ibid.*)

*Nature of the Current Offenses*

■ Appellant robbed three banks. He focuses on the fact that he did so without engaging in violent behavior, and asserts that the only losses suffered were financial losses. However, appellant's attempt to minimize the seriousness of his crimes in this fashion ignores the manner in which the Legislature has treated such offenses. Each of these offenses has been defined as both a "violent felony" (§ 667.5, subd. (c)(9)) and a "serious felony" (§ 1192.7, subds. (c)(19) & (d)). The effects of such classifications are many, and are extraordinarily serious. For example: section 667.5, subdivisions (a) and (b) imposes various mandatory and consecutive state prison enhancements. Section 1192.7 precludes the court, the prosecuting attorney, and counsel for a criminal defendant from engaging in plea bargaining except under certain narrowly defined circumstances. As serious felonies each of these offenses, committed by a person who has previously been convicted of a serious felony in this state (the appellant in our case is, of course, such a person), cause the application of additional mandatory and consecutive state prison sentence enhancements. (§ 667, subd. (a)(1).) Further, because each of appellant's three new bank robbery offenses are both "serious" and "violent" felonies, as defined by statute, they each invoke the application of the Three Strikes law, wherein the appellant, should he be convicted in the future of *any* felony offense, must receive an indeterminate sentence of life in prison, with a minimum term of at least 25 years. (§ 667, subds. (d) & (e)(2).)[5]

Finally, we should be mindful of the following declaration of legislative intent, which follows the listing of the 22 separate crimes defined as "violent felonies" (including, as noted above, the three crimes for which appellant was convicted in the instant case): "The Legislature finds and declares that these specified crimes merit special consideration when imposing a sentence to display society's condemnation for these *extraordinary crimes of violence against the person*." (§ 667.5, subd. (c), italics added.)

*Nature of the Offender*

On the date of the current offenses, appellant was 32 years old. He had attended school until the 12th grade. According to him, he had been using heroin since age nine. Both of his parents were heroin addicts, his sister was a heroin addict, and his grandparents were alcoholics. He had an extensive

---

[5]Although it is not directly relevant to this discussion, it should be noted that, as discussed elsewhere in this opinion, because of the fact that the appellant in our case has in fact suffered three previous serious and violent felonies, the sentencing provisions of section 667, subdivision (e)(2) were applied in this case, resulting in a total sentence of 85 years to life in state prison.

criminal background, beginning in 1984. In 1984 and 1985 he suffered juvenile adjudications for petty theft, burglary, receiving stolen property, battery on a peace officer, and falsely identifying himself to a peace officer. In 1986 he was convicted of residential burglary committed in 1985, and sentenced to two years in prison. He was paroled in November 1986, and had his parole revoked in early 1987 for an aggravated assault committed while he had been in prison on the burglary. Later that year he was convicted of three counts of robbery and sentenced to 12 years in prison. In 1992, appellant was convicted of possession of a weapon by a prisoner and sentenced to an additional two-year prison term. He was paroled in 1997. While on parole, he committed the bank robberies for which he has now been convicted.

*Proportionality of Punishment in Light of Offense and Offender*

We consider these facts in light of the factors enunciated in *People v. Dillon, supra,* 34 Cal.3d 441 to determine whether the sentence imposed on appellant was so disproportionate to the crimes as to shock the conscience. As noted, appellant seeks to minimize the severity of the crimes by characterizing them as nonviolent and not harmful. For the reasons discussed above, we decline to accept this characterization, and view the crimes as very serious. In any case, the current offenses, by themselves, are not what led to three consecutive 25-year-to-life sentences. Appellant has been committing crimes or incarcerated (and still committing crimes) almost without a break since 1984, spending only about six months out of jail in the past 12 years, during which time he committed these robberies.

Appellant contends that when considered in light of his family history and long-term drug addiction, the sentence imposed "shocks the conscience." The record does show that appellant has had problems with drugs since he was a child. As one court recently noted, however, "drug addiction is not necessarily regarded as a mitigating factor when a criminal defendant has a long-term problem and seems unwilling to pursue treatment." (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1511 [84 Cal.Rptr.2d 638].) Appellant also appears to have had a difficult upbringing, having been raised in, as he calls it, "a drug infested home," surrounded by family addiction and crime. Nonetheless, appellant is responsible under the law for his behavior, which he has not seen fit to amend. (*Ibid.*)

Finally, appellant claims that he should have been dealt with more leniently, because his crimes were not violent. Even if this were so, as we note above, recidivism is a legitimate factor to consider when imposing a greater sentence than for a first time offense. (See *People v. Martinez, supra,* 71 Cal.App.4th at pp. 1511-1512 & cases cited therein.) "[S]ociety is warranted

in imposing increasingly severe penalties on those who repeatedly commit felonies. If increased penalties do not deter the repeat offender, then society is warranted in segregating that person for an extended period of time." (*Id.* at p. 1512, citing *Rummell v. Estelle* (1980) 445 U.S. 263, 284-285 [100 S.Ct. 1133, 1144-1145, 63 L.Ed.2d 382].) In *Rummell,* the Supreme Court upheld a statutory scheme that resulted in life imprisonment for a nonviolent criminal upon a third conviction for a nonviolent felony. (445 U.S. at pp. 284-285 [100 S.Ct. at pp. 1144-1145].) And, in *Harmelin v. Michigan* (1991) 501 U.S. 957 [111 S.Ct. 2680, 115 L.Ed.2d 836], the court upheld the constitutionality of a statute imposing a life sentence without the possibility of parole for a single offense of possessing more than 650 grams of certain controlled substances. (*Id.* at p. 965 [111 S.Ct. at p. 2686].)

The comments of the concurring justices in *Harmelin*'s plurality opinion are fitting here: "Petitioner's suggestion that his crime was nonviolent and victimless . . . is false . . . . To the contrary, petitioner's crime threatened to cause grave harm to society. [¶] Quite apart from the pernicious effect of the individual who consumes illegal drugs, such drugs relate to crime in at least three ways: (1) A drug user may commit crime because of drug-induced changes in physiological functions, cognitive ability, and mood; (2) A drug user may commit crimes in order to obtain money to buy drugs; and (3) A violent crime may occur as part of the drug business or culture." (*Harmelin v. Michigan, supra,* 501 U.S. at pp. 1002-1003 [111 S.Ct. at p. 2706].) Thus, the court concluded that the life sentence without possibility of parole was not grossly disproportionate to the drug possession offense. (*Ibid.*)

In light of the nature of the offenses committed here, which were neither nonviolent nor victimless, and of appellant's lengthy, continuous and serious criminal history, we conclude that the sentence imposed was not disproportionate to the crimes charged. We therefore affirm.

### Disposition

The judgment and sentence are affirmed.

McGuiness, P. J., and Corrigan, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 12, 2001.