[Nos. G034527, G035629. Fourth Dist.; Div. Three. Feb. 28, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
GREGORY ROBERT GAYTON, Defendant and Appellant.

[No. G035629. Fourth Dist., Div. Three. Feb. 28, 2006.]

In re GREGORY ROBERT GAYTON on Habeas Corpus.

**COUNSEL**

Jennifer A. Gambale, under appointment by the Court of Appeal, for Defendant, Appellant and Petitioner.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Scott T. Taylor, Daniel Rogers and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BEDSWORTH, Acting P. J.**—Occasionally, we see a case that "fell through a crack." This case fell through a chasm. And no one, not the trial attorney, not the prosecutor, not the court—and certainly not the probation officer—can escape some degree of responsibility for the existence of that chasm. When the issue is whether a defendant goes to prison for seven years or to a drug rehabilitation program, someone should be paying attention. In this case, it appears no one but the defendant really was.

Gregory Robert Gayton appeals from an order revoking his probation and requiring him to serve a seven-year term in prison. He argues the evidence was insufficient to support the determination he violated the terms of his probation. Gayton also petitions for a writ of habeas corpus, now consolidated with the appeal, alleging the attorney who represented him at the probation revocation hearing was ineffective because he failed to review Gayton's probation file and present it as evidence to impeach the probation officer's testimony. That file in fact completely contradicted the probation officer's recollection that Gayton had never even reported, and supported Gayton's own version of his efforts to comply with the terms and conditions of his probation. And yet no one bothered to read the file as a means of ascertaining which of the two was testifying accurately.

As the Attorney General essentially concedes, the failure of Gayton's counsel to examine the file, despite the marked contrast between Gayton's version of what had occurred and that of the probation officer, constituted ineffective assistance. And we conclude the prejudice flowing from that failure is manifest. The trial court could only assume Gayton's counsel was acting appropriately (it did not expressly inquire), and thus that he had at least *examined* the only record which might have provided support for his client's story. His subsequent failure to offer that record into evidence must have appeared to be an implicit acknowledgement it did not support Gayton's contentions. So the effect of counsel's failure to look at the file was to nail shut any doors his client's credibility might have opened at the hearing. We cannot imagine a more clearly prejudicial effect.

Because we conclude the petition must be granted, and Gayton is entitled to a new hearing, we need not address the additional arguments made in support of the appeal. That appeal is consequently dismissed as moot.

\* \* \*

Gayton was initially charged with: (1) felony evading a police officer while driving recklessly (Veh. Code, § 2800.2); (2) possession of methamphetamine

(Health & Saf. Code, § 11377, subd. (a)); (3) child neglect (Pen. Code, § 273a, subd. (a)); (4) misdemeanor destroying and concealing evidence (Pen. Code, § 135); (5) misdemeanor possession of marijuana (Health & Saf. Code, § 11357 subd. (b)); and (6) misdemeanor resisting arrest (Pen. Code, § 148, subd. (a)(1)). The complaint additionally alleged Gayton had committed three prior felonies for which he served at least a year in prison. (Pen. Code, § 667.5, subd. (b).)

Pursuant to agreement, Gayton pled guilty to all six counts of the complaint, and admitted the three priors. He was sentenced to seven years in prison, but execution of that sentence was stayed. The court then placed him on three years of supervised probation, on the condition he serve one year in the county jail, followed by one year in a "live-in" drug rehabilitation facility and one year of aftercare. The terms of Gayton's probation included, amongst the usual generica, several specific requirements, such as refraining from illegal drug use, plus a more general requirement that he "obey all laws, orders, rules and regulations of the Probation Department, Court and jail." Gayton was specifically advised that upon "failure to complete" the three-year program the courts would "execute suspended sentence."

Gayton was released from jail at the end of March 2004. On May 4, 2004, Gayton's probation officer, Thomas Erikson, executed a warrant declaration stating Gayton had not reported to probation on April 5, 2004, as directed, that his whereabouts were unknown and efforts to locate him had "been met with negative results." The declaration further stated Gayton had been directed by the court and his probation officer to enter and complete a one-year residential drug program, but had not done so. Gayton was described as accomplishing only poor compliance with the terms and conditions of his probation, and Erikson recommended that when Gayton was arraigned on the requested warrant, his probation be revoked.

On May 24, 2004, the court issued the warrant and ordered Gayton's probation revoked. A week later, Gayton was stopped for a traffic violation and arrested. The court then recalled the warrant, and set a hearing to adjudicate the probation revocation request.

The probation revocation hearing commenced on August 13, 2004, with Erikson's testimony. Erikson acknowledged that he was the probation officer assigned to Gayton's case. While he admitted he had failed to bring Gayton's probation file to court, he testified he had reviewed it previously, most recently in May of 2004, after he had filed the petition seeking revocation of Gayton's probation.

Erikson testified, based upon his recollection, that Gayton was required to report to probation for the first time on April 5, 2004, but had not done so. He

stated unequivocally that he had *never* had *any* contact with Gayton, and that "as far as I know" Gayton had never made any attempt to contact him.

On cross-examination, Erikson stated of Gayton, again unequivocally, "I've never seen him before." He also denied ever conducting any drug testing on Gayton, and repeated "I have no recollection, at all, of him."

Erikson was also asked "how much time [Gayton was allowed] to show that he'd gotten enrolled in a residential drug treatment program?" He responded "*I never saw him, so I never gave him an exact time period to get in.*" Erikson also denied giving Gayton any referrals to programs, explaining "I have no recollection of seeing him. I would have given him referrals at that time."

Gayton then took the stand, and told a story from a different universe. He insisted he *had* reported to probation, indeed directly to Erikson, on at least three occasions. His said his first meeting with Erikson was on March 22, 2004, a Monday. During that meeting, Erikson took his picture, which proved to be a difficult process, as the camera system was new. They discussed the fact Gayton was also on parole, and Erikson asked for the name and location of Gayton's parole officer. He inquired where Gayton was living, and was told he was living in Long Beach.

During that first meeting, Erikson also asked Gayton what he was doing to enroll in a drug program. Gayton explained to him that he had learned of a drug program in San Clemente through the Parolee Services Network, and because it was not a free program, he was applying to get funding for it.

Gayton said he met with Erikson again the next week. During that meeting, Erikson administered a drug test, and told Gayton he had to start attending Narcotics Anonymous (NA) meetings. Gayton told him he already had been attending. Erikson asked what Gayton's parole officer thought of his living in Long Beach, and Gayton told him the parole officer did not consider it a problem pending his admission into the drug program.

Gayton met with Erikson again on April 5, 2004. At about that time, Gayton had submitted his application for funding for the drug program, and had been told it would take about a month to process. Gayton expected that his parole officer would notify him when his application was determined. He promised to keep Erikson updated on his progress. At the conclusion of the meeting, Erikson told Gayton that "if nothing changed in-between the time of my next visit, which was supposed to be May—the first week of May—just to come in the first week of May. [¶] And if anything did change, to call and let him know."

According to Gayton, something did change. In late April, his mother-in-law was in a serious automobile accident in Bakersfield. Gayton drove with his wife to Bakersfield to see her. They remained in Bakersfield, essentially full time, for three to four weeks. His mother-in-law died in late May of 2004.

Gayton said he called both his parole officer and Erikson to inform them of his unexpected departure for Bakersfield. He spoke with his parole officer, who told him that no matter what the emergency, he had to be back to report in person on June 5. Gayton was unable to reach Erikson directly, however, and left a message which included numbers where he could be reached. Erikson did not return the call, so Gayton said he called him and left additional messages at least two times during the period he was staying in Bakersfield.

Also during the period he was in Bakersfield, Gayton returned to the Orange County area on several occasions to attend NA meetings. On one occasion, he actually stopped by the probation office, but the receptionist informed him Erikson was not in. She assured Gayton she would make a note of his visit in a log she maintained.

In response to the court's questioning, Gayton acknowledged he was aware there were residential drug programs available to him free of charge, such as through the Salvation Army, and that he could have enrolled in one at any time simply by showing up. However, he explained that he had chosen to seek funding for the "Mainstream Program" because he felt he would have a better chance of success if he got a fresh start in a different area: "I wanted to get out of the area of Anaheim, because I know a lot of people. And I wanted to go somewhere where I didn't know anyone. And that's why I was going to San Clemente." He told the court he was scheduled to learn whether his funding application for the Mainstream Program had been accepted during his June 5, 2004 meeting with his parole officer. However, because he was arrested June 1, he never learned that result.

So the court had before it two radically different accounts. The probation officer said he had never—ever—had any contact whatsoever with the probationer, and the probationer described several rather complex interactions between the two in considerable detail.

No other witnesses were called, and after hearing argument from counsel, the court found Gayton in violation of the terms of his probation and resentenced him to seven years in prison. The court explained: "It appears that [Gayton] was in Orange County, routinely and regularly. That Bakersfield is only a four-hour drive. He has a car, when he was ordered to report in

May; which he did not do. By his own admission, he did not do [so]. [¶] I don't think he was told to call and leave a message. He was told to report. As having been on probation and parole, you should know better. You should know that when somebody tells you to report, you have to report. And the one-year live-in drug program was not at your convenience, but immediately. It appears that you applied in March; but then took no further steps to get yourself into any steps, or to make sure that you were getting into a program. [¶] So the court finds you in violation."

In support of his petition for habeas corpus, Gayton offered as evidence the contents of the probation file not utilized during the revocation hearing. Those contents substantially support the testimony Gayton offered at the hearing, and demonstrate that Erikson's repeated assurance he had "never seen" Gayton was—not to put too fine a point on it—brutally incorrect.

The probation file, although thin, contains handwritten notes, presumably made by Erikson himself, documenting at least two meetings with Gayton, the first one on March 22, 2004, and the last on April 5, 2004.[1] During the first meeting, Gayton provided Erikson with not only the name, but also the phone number for his parole officer. He told Erikson where he was living, and that he anticipated entering the Mainstream Program for drug rehabilitation in San Clemente—just as he described to the understandably skeptical trial judge at the revocation hearing. There is also a reference that appears to say "Drug test neg," dated "3/25."

The notes then reflect that during the April 5 meeting, Gayton informed Erikson that "funding [was] pending on his entry into program." There is also another note stating "Drug test neg," which appears to be dated "4/12."

Gayton's habeas corpus petition is also supported by a declaration from counsel who represented him at the revocation hearing. Counsel explains that he did not obtain or review a copy of Gayton's probation file in preparation for the hearing. He did speak with the probation officer, Erikson, prior to the hearing, and states he "did not get any indication that [Erikson] was less than truthful with me." He acknowledges he "had no tactical reason for not obtaining a copy of or otherwise viewing Mr. Gayton's probation file." In other words, he assumed his client was lying and did not bother to take even the most basic steps to test that assumption.

■ The standard for establishing a claim for relief based upon the ineffective assistance of counsel is cogently explained in *People v. Cuevas*

---

[1] The notes are handwritten, and contain numerous shorthand-type references. Thus, it may be impossible for anyone other than the writer—again, presumably Erikson himself—to decipher them completely and authoritatively. Nonetheless, the fact of those two visits, as well as several of the matters discussed during the visits, are clear.

(2001) 89 Cal.App.4th 689, 696 [107 Cal.Rptr.2d 529]: "Every criminal defendant is constitutionally entitled to competent legal representation. (*People v. Pope* (1979) 23 Cal.3d 412, 424 [152 Cal.Rptr. 732, 590 P.2d 859].) In order to establish a claim of ineffective assistance of counsel, an appellant must show that the attorney's representation was deficient, in that it fell below an objective standard of reasonableness, and that the appellant was prejudiced by counsel's deficient performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688 [104 S.Ct. 2052, 80 L.Ed.2d 674]; *People v. Ledesma* (1987) 43 Cal.3d 171, 216–217 [233 Cal.Rptr. 404, 729 P.2d 839].) . . . To establish prejudice, an appellant must show that but for counsel's assertedly deficient representation it was reasonably probable that the outcome of the proceeding would have been more favorable to the appellant. (*Strickland v. Washington, supra*, at pp. 688, 693–694 [104 S.Ct. 2064–2065, 2067–2068]; *People v. Ledesma, supra*, at pp. 215–218.)"

Applying that standard to this case can produce but one result. First, there is simply no justification for counsel's failure to review the file. His client was telling one story, and the probation officer was telling one in diametric opposition. There was no room here for difference of opinion: One of them was right and one was wrong. The file was the only evidence that might have shown which was which. Indeed, the Attorney General does not dispute the point—his analysis of the issue actually begins with the statement "[e]ven assuming that defense counsel should have obtained the file prior to the revocation hearing, appellant has failed to demonstrate prejudice." With that assertion, however we cannot agree.

In our view, the conclusion Gayton was prejudiced by his counsel's omission is inescapable. No matter how inaccurately, Erikson's testimony painted a compelling picture. He stated unequivocally, and repeatedly, that he had *never set eyes on Gayton*. He portrayed Gayton as someone who had made no effort, whatsoever, to comply with his probation requirements.

Gayton, by contrast, told a fairly detailed story of his interactions with Erikson. Indeed, some of those details, including specifically the fact that Erikson had experienced substantial difficulty with the new camera system while attempting to take Gayton's photo, are nearly impossible to reconcile with Erikson's claim that he had no recollection of ever seeing Gayton at all. The contrast made Gayton look not only like a failed probationer, but also a perjurer—and an enthusiastic one at that. It is hard to conceive of anything more prejudicial during a probation revocation hearing.

The Attorney General suggests that Gayton's counsel may have undermined Erikson's testimony even without the file, and that the court might have concluded Gayton was truthful, because "defense counsel's cross-examination . . . effectively demonstrated that Officer Erikson . . . quite

possibly had forgotten about his three meetings with appellant." We are not persuaded. While Erikson did acknowledge he had numerous probationers under his supervision, he never suggested it was possible he might have entirely forgotten a probationer he had met on three different occasions. Erikson's testimony, if nothing else, was consistent. And the judge's ruling made it clear she adopted his version of the facts.

Of course, had Gayton's probation file been reviewed and utilized, it would have revealed that Erikson's "recollections" were not worth the paper they were transcribed on. While we hesitate to suggest he might have been intentionally misrepresenting facts to the court, the file does suggest his conduct was something beyond ordinary negligence. Erikson's sworn warrant declaration, executed at a time when he presumably had the probation file handy, states Gayton "failed to report on April 5, 2004, as directed." That claim is directly contradicted by the notes in the file. Moreover, the declaration further states that "[e]fforts to locate the probationer have been met with negative results," despite the fact that Gayton had apparently kept in touch at all times with the parole officer whose *name and telephone number* were in the probation file. Did Erikson's "efforts" not include contacting him?[2]

We also reject the Attorney General's suggestion that the content of the probation file, if known, would not have helped Gayton in any event. While it is true the file includes a note indicating Gayton had skipped an appointment with the Mainstream Program on April 30, 2004, there is no indication of the circumstances. It is thus impossible to tell whether that fact is particularly significant. Likewise, the fact that Gayton may have missed his probation appointment on March 25, 2004,[3] is not explained. For all we know, the absence was excused. In any event, those lapses, if that is what they were, pale in comparison to what Erikson had claimed were Gayton's transgressions and the effect of his contradiction of Gayton's elaborate recital of meetings with Erikson.

Nor are we persuaded that, in light of the reasons the court gave for revoking probation, the file would have done little to appease its concerns. First, the court stated that Gayton had failed to report to probation in person in May, noting "I don't think he was told to call and leave a message. He was

---

[2] We recognize that an argument can be made that the probation officer has no affirmative duty to attempt to track down his probationers—in fact, that very argument was made to the trial court by the prosecutor in this case. We need not decide whether it's a persuasive one, however, because whether or not Erikson was obligated to do so in the abstract, he signed a declaration stating it had been done.

[3] The Attorney General interprets the notation "FTR" on that date as "failed to report." While that is a reasonable deduction, we have no way of knowing whether it is correct, and the file also reflects a negative drug test on March 25, so we are hesitant to adopt the position that he failed to report without more information.

told to report." But the uncontradicted evidence, offered by Gayton, was that he was told to report in person, or, *if something changed, to call.* The record makes it clear he did that.

Moreover, Gayton also testified that he did, in fact, stop by the probation office at least once during the time he had been staying primarily in Bakersfield. Erikson, who had not returned any of Gayton's several calls, was not there at the time. Consequently, had the court been inclined to believe Gayton's testimony, the assertion that Gayton had violated probation by failing to report in person in May could not have been sustained. The content of the probation file, demonstrating Gayton was significantly more worthy of belief than Erikson, could not have been less than crucial.

The second reason given for revocation was that Gayton had taken too long to get himself into his one-year residential drug treatment program. But here again, the probation file supports Gayton's contention he had informed Erikson of his plan to attend the Mainstream Program and was waiting for approval of his funding application before he could enroll. There is no indication that he was ever told that plan was unacceptable, or that he was given any specific deadline by which he must be enrolled in a program. Indeed, while Erikson implied in his testimony that he might normally have given a parolee a deadline by which he must be enrolled, he expressly denied having done so in this case. More importantly, given Erikson's shaky credibility, the file reflects no imposition of such a deadline.

And of course, the circumstances of Gayton's abrupt departure for Bakersfield should not be ignored. While the court was entirely correct in stating he could not simply treat his probation obligations as matters to be dealt with at his own convenience, these circumstances are at least extenuating. Combine that with Gayton's efforts to remain in contact with Erikson during his time in Bakersfield, not to mention his continued attendance at NA meetings, and the picture appears fairly favorable.[4] Gayton may not have been perfect, but the idea of perfect probationers is oxymoronic, and perfection is therefore not the standard against which probation performance is judged. Under these circumstances, "unfair" seems a mild word to describe the revocation of Gayton's probation without any warning he was considered to be failing. We doubt the trial judge could have arrived at this result had she been apprised of the information in the probation file.

Finally, we must emphasize that if this case is not an utter anomaly, it is a frightening example of what can occur when all the participants forget how

---

[4] Nor is the irony of Gayton's being punished by the court for not having contacted his probation officer while in the area after he had driven 156 miles from Bakersfield to attend NA meetings lost on us.

high the stakes are in a probation revocation hearing. We have no problem concluding Gayton's counsel had the primary obligation to review and present the evidence that might have assisted his cause. But prosecutors always bear some responsibility for the evidence they offer. And when it became clear during the hearing that the facts were so hotly contested, and that the probation officer had neither brought the file nor reviewed it in the last three months, it was perhaps incumbent upon the court to consider issuing an order to produce the file on its own motion. In short, it must be remembered that *everyone* in this case had a stake in getting at the truth: All failed. The appeal is dismissed. The petition is granted.

Moore, J., and Ikola, J., concurred.