[No. A114023. First Dist., Div. One. May 14, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
HORACE BORDELON, Defendant and Appellant.

1312

**COUNSEL**

Susan Burke, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Seth K. Schalit, Kelly M. Croxton and Brent W. Wilner, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MARCHIANO, P. J.**—A week out on parole after years of incarceration precipitated by an inartful bank robbery, defendant Horace Bordelon returned to the same bank and robbed it again ineptly and was quickly caught allegedly because he wanted to return to prison. That in fact became his defense: Having trouble coping with the pressures of life outside prison, Bordelon robbed the bank to cause himself to be returned to the routine of prison life. His defense was supported by expert testimony on "institutionalization," a dependence on life in an institutional setting that made living outside the institution akin to adjusting to a new culture. But the jury did not buy it.

Defendant was convicted by the jury of second degree robbery (Pen. Code, § 211), and found by the jury to have previously been convicted of second degree robbery, and of battery by a prisoner on a nonconfined person (Pen. Code, § 4501.5). He was sentenced to 11 years in prison, representing the midterm of three years for the robbery conviction, doubled as a second strike, plus five years for a prior serious felony conviction (Pen. Code, § 667, subd. (a)(1)).

Insofar as we can tell, institutionalization has never before been ventured in this state as a defense to criminal prosecution. Defendant unsuccessfully argued that hoping to get caught when he took the money, he did not intend to permanently deprive the bank of its property as required for a robbery conviction. So we have a bank robbery case, likely one of the very few, where a unique motive is the central issue.

This appeal challenges a standard motive instruction given to the jury, and raises additional claims of error involving jury instructions, exclusion of defense evidence, and alleged prosecutorial misconduct. Few trials are perfect and this one was no exception, but the errors were not significant and did not, individually or cumulatively, affect the judgment.[1] Accordingly, we affirm.

## I. RECORD

Defendant walked up to Rosalinda Yadao's teller window at the Oakland City Center branch of Wells Fargo Bank at 12th Street and Broadway on the morning of July 1, 2004, pushed aside the customer Yadao was helping, and told Yadao to "put the money in the plastic bag" he had placed on the

---

[1] See California Constitution, article VI, section 13.

counter. Yadao, who was writing out a withdrawal slip for the customer, looked up and defendant said, "This is a robbery. Put your money in the plastic bag." The second demand was louder and sounded more like a command, and Yadao realized that "it was a robbery and he wasn't kidding." Defendant demanded money a third time, repeating that it was a robbery and telling her to hurry up. This demand was even louder and he was getting upset. In response Yadao grabbed bills from her drawer and put them in the bag, along with bait money that concealed a tracking device.

Meanwhile, the teller next to Yadao, Yvette Orona, saw what was going on and went to another teller, Martha Rodriguez, and told her that Yadao was being robbed. Orona called 911 and connected with the operator as defendant was leaving the bank. Rodriguez testified that defendant left the bank at a pace "somewhere in between a fast walk [and] a slow jog"; Orona and Yadao, as well as three customers in the bank at the time whose testimony was entered for the defense via stipulation, recalled defendant walking, not running, out of the bank. Orona described defendant to the 911 operator and reported, "He's just left out the door. He was going towards Broadway. He's actually on the corner of 12th and Broadway going down towards Jack London Square and now he's running."

Oakland Police Officer Jimmy Wong was in a marked patrol car two or three blocks from the bank when he received a report of the robbery. As he approached the bank he saw defendant, who was not walking quickly, just strolling, when he passed in front of Wong's car at 11th Street and Broadway. Although defendant matched the description of the robber, Wong was not positive that defendant was the suspect so he continued on toward the bank. Another officer in a patrol car then reported that the tracking device was emitting a signal going east on 11th. Wong made a U-turn, pulled in behind the other officer's car, and they arrested defendant without incident. Defendant was apprehended, walking along the street, unarmed, holding the plastic bag with $643 taken from the bank. He was captured less than two minutes after Orona reported the direction he was heading when he left the bank.

Defendant had robbed the same branch of the bank on August 20, 1997. Rodriguez was the teller on that occasion. As in the 2004 robbery, he put a plastic bag on the counter and directed that money be put in the bag. As in 2004, he wore no disguise, made no threat, displayed no weapon, and walked out of the bank with a tracking device in the cash he had taken. After the 1997 robbery, defendant caught a cab; Oakland Police Officer Roy Flecklin traced the tracking device signal to the cab, pulled the cab over, and arrested

defendant without incident 13 or 14 minutes after picking up the signal. Flecklin did not tell defendant about the tracking device when he arrested him. Flecklin said that such devices are often discarded by experienced robbers, but that the device had also enabled him to catch people with lengthy histories of robberies.

Defendant was continuously incarcerated, aside from one 5-month period, from 1997 to 2004, and he had been released from prison for only a week when he returned to the bank on July 1, 2004. Apart from questioning whether the element of force or fear required for robbery was satisfied, his defense was that he took the money because he wanted to get arrested and returned to custody. Given that motivation, he argued that he could not be convicted of robbery because he did not intend to keep the ill-gotten money.

Defendant's sister, Sherry Bordelon, testified that defendant exhibited paranoia as a youth, and suffered from delusions after sustaining a brain injury in a carjacking when he was 22 years old. He could not keep a job and never consistently took the medications prescribed for his mental illness. She had told defendant that he could live with her after he got out of prison in 2004, but she was in the hospital when he was released and she had no contact with him until after he was arrested.

Clinical psychologist Marlin Griffith reviewed defendant's psychiatric records and interviewed defendant for one and one-half hours about three weeks before trial. He opined that defendant suffered from a "psychotic disorder not otherwise specified," a diagnosis recognized in the DSM-IV (Diagnostic and Statistical Manual of Mental Disorders; DSM), the manual that clarifies diagnoses and assigns codes to mental illnesses. Defendant's primary symptoms were auditory hallucinations, delusions, and paranoid thoughts and feelings.

Griffith discussed the phenomenon of "institutionalization," which he described as "a gradual psychological change in which the individual becomes dependent upon the institution, and that might be prison. It's seen very often in the mental health system in relation to hospitals." Griffith said that institutionalized individuals' "ability to relate and function without the institution is much more restricted than their ability to function within the institution, and there then becomes a preference for that institutional environment as opposed to outside of the institution." He explained that "there's [a] gradual taking on or incorporating the whole culture of the institution. It's a gradual process . . . in which the person becomes very dependent," and loses self-esteem. An institutionalized person "would be much more anxious,

uncomfortable, unsettled outside of that institutional structure," like "a fish out of water."

Based upon his examination of defendant and review of defendant's records, Griffith opined that defendant exhibited behavior consistent with institutionalization. Griffith said that defendant had expressed anxiety about being released from prison, and that he had difficulty after he was paroled. Based on defendant's statements and information in the records, Griffith attributed his "inability to pull himself together and function" after being paroled to the lack of "structure outside of prison."

Griffith had not found the term "institutionalization" in the DSM, but said that the phenomenon was subsumed in the manual's reference to "a culturation problem, the problem of adjusting in a different culture." Griffith admitted that he did not investigate how well defendant was able to function during his five months of freedom in the period from 1997 to 2004. Griffith acknowledged that defendant had a parole officer to help him adjust to life outside of prison, and that defendant found places to stay in two community-based programs during the week he was free.

Defendant's institutionalization defense was explained to the jury in his attorney's opening statement, where counsel argued that, because of this mental condition, he did not have the "specific intent to permanently deprive Wells Fargo Bank of their money" that was required for a robbery conviction. Counsel submitted that "Mr. Bordelon went into that bank for one reason and one reason only. He wanted to get caught holding the money so that he can go back to jail. He was not interested in keeping the money; he was not interested in getting away. He was interested in getting caught and getting arrested holding the money. And when a man who suffers from mental illness like Mr. Bordelon goes into a bank deliberately to get arrested and go back into custody, he commits no crime, only a cry for help."

In closing argument, defense counsel described defendant as a man "on the brink" after his release from prison, likely suffering from paranoia and delusions, not knowing where he would get his next meal or sleep at night. "He found his world collapsing in upon him, and . . . did the only thing . . . he could think of to bring order and a semblance of control back in his life. He got himself arrested so that he could go back behind those prison walls." "[W]hat kind of bank robbery scheme is this?" counsel asked, "You walk into the bank undisguised and walk out of the bank and expect to get away with it?" Counsel noted that defendant did not attempt to escape through the BART (Bay Area Rapid Transit) station next to the bank, and was just

"strolling along" when he was arrested. "The prosecution may argue to you that, okay, maybe part of him wanted to keep the money, and maybe part of him wanted to get arrested. That may be true. But it's not supported by the facts of this case. [¶] The way that he committed this offense made him a sitting duck." Counsel concluded his argument with a reference to the inmate in the movie The Shawshank Redemption (Columbia Pictures 1994) who could not cope with life outside of prison after his release and hanged himself.

The jury deliberated less than one and one-half hours before finding defendant guilty.

## II. DISCUSSION

### A. *Lesser Included Offense Instruction*

Defendant contends that the court erred in refusing his request to instruct the jury on the lesser included offense of grand theft. (See generally *People v. DePriest* (2007) 42 Cal.4th 1, 50 [63 Cal.Rptr.3d 896, 163 P.3d 896] [theft is lesser included offense of robbery; robbery includes an added element of force or fear].) When the instruction was discussed below, defense counsel observed that no force was used, and submitted that fear was a jury question because defendant made no threat and did not have, or pretend to have, a weapon.

■ " 'The element of fear for purposes of robbery is satisfied when there is sufficient fear to cause the victim to comply with the unlawful demand for [her] property.' " (*People v. Davison* (1995) 32 Cal.App.4th 206, 212 [38 Cal.Rptr.2d 438] (*Davison*).) "The extent of the victim's fear 'do[es] not need to be extreme . . . .' " (*Id.* at p. 216.) "[T]he fear necessary for robbery is subjective in nature, requiring proof 'that the victim was in fact afraid, and that such fear allowed the crime to be accomplished.' " (*People v. Anderson* (2007) 152 Cal.App.4th 919, 946 [61 Cal.Rptr.3d 903].) "Actual fear may be inferred from the circumstances, and need not be testified to explicitly by the victim." (*People v. Cuevas* (2001) 89 Cal.App.4th 689, 698 [107 Cal.Rptr.2d 529].) " ' "Where intimidation is relied upon, it [can] be established by proof of conduct, words, or circumstances reasonably calculated to produce fear." ' " (*People v. Brew* (1991) 2 Cal.App.4th 99, 104 [2 Cal.Rptr.2d 851] (*Brew*); see also *Davison, supra*, at p. 214 [intimidation and fear are synonymous in this context].)

Yadao testified that she was trained as a teller to remain calm and follow robbers' instructions during a robbery. Yadao said that when she was speaking on the phone with police one or two minutes after defendant left the

bank she was "really nervous," "really shaken," and "trying to gasp for air." After the tape of the call was played for the jury, Yadao explained that she was breathing heavily during the conversation because she was "shaken" and "scared" in "a reaction from shock, when you've been traumatized or shocked, and then all of a sudden you will start feeling this anxiety." Although she did not see a weapon, she did not know whether defendant was armed.

■ "[T]he existence of 'any evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed. [Citations.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 162 [77 Cal.Rptr.2d 870, 960 P.2d 1094], italics omitted.) The court found no evidence that Yadao's training prevented her from being afraid when the money was taken, and determined that the evidence for grand theft was too "minimal or insubstantial" to warrant an instruction on that lesser offense.

■ The court's ruling was correct. While there was no evidence that defendant used a weapon, assaulted Yadao, or verbally threatened her, "[s]uch factors . . . are not requisites for a finding of robbery." (*Brew, supra,* 2 Cal.App.4th at p. 104.) Defendant's words and conduct—his pushing a customer aside, his escalating demands for the money—were reasonably calculated to intimidate Yadao, and her testimony established that she was in fact "shocked" and "traumatized" by his actions. The element of fear was proven here, and no instruction on mere theft was warranted. (See *People v. Gonzales* (2003) 114 Cal.App.4th 560, 570 [8 Cal.Rptr.3d 88].)

## B. *Motive Instruction*

The jury was instructed on motive pursuant to Judicial Council of California Criminal Jury Instructions (2006) CALCRIM No. 370 that: "The People are not required to prove that the defendant had a motive in any of the crimes [*sic*] charged. In reaching your verdict you may, however, consider whether the defendant had a motive. Having a motive may be a factor tending to show that the defendant is guilty. Not having a motive may be a factor to be able to show that the defendant is not guilty."

Defendant requested that this instruction be omitted or modified to account for his defense that his motive in taking the money, i.e., the desire to be incarcerated, tended to show that he was innocent, not guilty. His counsel

"propose[d] not giving the instruction at all, or in the alternative modifying the instruction so that the second paragraph reads, having a motive may or may not be a factor tending to show that the defendant is guilty; not having a motive may or may not be a factor tending to show that the defendant is not guilty." Counsel argued that the language of the standard instruction would be misleading insofar as it "suggest[ed] to the jury that the motive is an element that points towards guilt when in fact in this case, we feel that the motive points towards innocence."

The court did not agree that the motive instruction would be misleading, thought that "this instruction taken together with the specific intent instruction which embodies your defense adequately delineates the issues," and denied defendant's requests. The jury was instructed with respect to specific intent that to convict defendant of robbery it had to find that, in using force or fear to take the property, he "intended to deprive the owner of it permanently or to deprive an owner temporarily but for an unreasonable time so as to deprive him or her of a major portion of its value or enjoyment."

Defendant argues that the refusal to modify the motive instruction as requested deprived him of his right to an instruction on the defense theory of the case, and that the standard instruction was misleading here because, "[r]ather than instructing the jury that motive evidence might be relevant to the defense, the instruction given informed the jury only that evidence of motive could tend to show that a defendant was guilty. This instruction was particularly problematic, and undoubtedly confusing, because, under the circumstances of this case, there actually was no motive evidence that tended to suggest guilt. The *only* evidence of motive related to the defense theory of the case."

■  The question presented by these contentions "is whether there is a 'reasonable likelihood' that the jury understood the charge as the defendant asserts." (*People v. Kelly* (1992) 1 Cal.4th 495, 525 [3 Cal.Rptr.2d 677, 822 P.2d 385].) In making that determination, we consider the language of the instruction at issue, the instructions as a whole, and the arguments of counsel. (*Id.* at pp. 525–526.)

The challenged instruction correctly states that motive may tend to show guilt. Defendant is mistaken in claiming that there was no evidence of a guilty motive here. This is after all a bank robbery case, and while it ordinarily goes without saying, criminals rob banks to get money. Defendant may have had any number of reasons, apart from any desire to be imprisoned, for doing what he did.

██ To the extent the motive instruction implied that motive cannot support a defense, the implication was effectively negated by the specific intent instruction and the arguments of counsel. While motive and intent are not synonymous (*People v. Hillhouse* (2002) 27 Cal.4th 469, 504 [117 Cal.Rptr.2d 45, 40 P.3d 754] (*Hillhouse*)), the intent instruction allowed defendant's alleged motive to be taken into account as it bore on his desire to deprive the bank of its money, a point that was very clearly driven home in the defense arguments. Thus, it is not reasonably likely that the jurors would have construed the motive instruction to preclude them from considering his defense of institutionalization. "As long as the trial court has correctly instructed the jury on all matters pertinent to the case, there is no error." (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 277 [107 Cal.Rptr.2d 160].)

## C. *Prosecutorial Misconduct*

Defendant contends that the prosecutor committed misconduct in final closing argument by referring to the date defense expert Griffith was hired—a matter not in evidence. The transcript reads in relevant part:

"[The Prosecutor]: Criminal cases normally fall within three general categories for defenses: one, the defendant is saying there was no crime; two, there was a crime but I didn't do it or; three, there was a crime, I did it, but there's not enough evidence to prove beyond a reasonable doubt that I'm guilty.

"What do we have here? There was a crime. We know that a robbery was committed; we know the defendant did it. And we know that beyond a reasonable doubt that he is the one that did it and that he is guilty. So what is the defense left with? They are almost in uncharted territory where they have to create something.

"So what do they do? Two weeks before this trial begins, two weeks before you were brought in and sat there as potential jurors, they hire a doctor.

"[Defense counsel]: Objection. Assumes facts not in evidence.

"The Court: Overruled.

"[The Prosecutor]: The doctor testified the first and only time he met with the defendant was on March 3rd, 2006, almost a year and a half after this crime. . . ."

Jury selection in the case had begun on March 22, 2006.

While the jury was deliberating, defense counsel elaborated on his objection to the argument about when Griffith was hired. Counsel noted that the date of Griffith's hiring was not in evidence, and that the prosecutor had misrepresented that date in any event. Counsel pointed out that the prosecution knew that the defense was seeking an expert in January 2006, when the trial was continued because the defense needed further time to consult with expert witnesses, and that the prosecution knew Griffith was not hired two weeks before trial because it received his curriculum vitae from the defense in February 2006.

■ "Counsel may not state or assume facts in argument that are not in evidence. (*People v. Stankewitz* (1990) 51 Cal.3d 72, 102 [270 Cal.Rptr. 817, 793 P.2d 23].) That said, we accord counsel great latitude at argument to urge whatever conclusions counsel believes can properly be drawn from the evidence. (*People v. Thomas* (1992) 2 Cal.4th 489, 526 [7 Cal.Rptr.2d 199, 828 P.2d 101].)" (*People v. Cash* (2002) 28 Cal.4th 703, 732 [122 Cal.Rptr.2d 545, 50 P.3d 332] (*Cash*); see also *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 102 [17 Cal.Rptr.3d 710, 96 P.3d 30].)

■ Because no evidence was presented on the date of Griffith's retention, it was misconduct for the prosecutor to refer to that date in argument, and the misconduct was exacerbated insofar as the proximity of that date to the trial was exaggerated. The People contend that the error cannot be raised on appeal because trial counsel merely objected to the question without requesting that the jury be admonished to disregard the impropriety. (See *People v. Hill* (1998) 17 Cal.4th 800, 820 [72 Cal.Rptr.2d 656, 952 P.2d 673] (*Hill*) [defendant must generally make an assignment of misconduct and request a curative admonition].) However, it may be futile or impracticable to request an admonition, and the failure to make such a request is excusable where, as here, the defendant's objection is immediately overruled. (*People v. Stitely* (2005) 35 Cal.4th 514, 559–560, fn. 21 [26 Cal.Rptr.3d 1, 108 P.3d 182], citing *Hill, supra,* 17 Cal.4th at pp. 820–821.)

■ Defendant contends that the error is of federal constitutional dimension and cannot be deemed "harmless beyond a reasonable doubt" under *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]. "Prosecutorial comment is reversible as misconduct under the federal Constitution when it ' "so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process" ' "; improper comment that "falls short of rendering the trial fundamentally unfair" is error under state law. (*Cash, supra,* 28 Cal.4th at p. 733.) "[I]n cases where jurors are improperly exposed to certain factual matters, the error is usually tested under

the standard set out in *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]" (*People v. Garcia* (1984) 160 Cal.App.3d 82, 93, fn. 12 [206 Cal.Rptr. 468]), and this case is no exception. The single improper statement in this case did not render the trial fundamentally unfair and did not constitute federal constitutional error.

■ Applying the *Watson* standard, we find no reasonable probability that the error affected the outcome here. The timing of Griffith's retention was cited in order to cast doubt on the institutionalization defense on the ground that it was conceived at the last minute or at least developed two weeks before trial when the defense expert first interviewed defendant. While the argument does not seem particularly persuasive, "prosecutors 'have wide latitude to discuss and draw inferences from the evidence at trial,' and whether 'the inferences the prosecutor draws are reasonable is for the jury to decide.' " (*People v. Monterroso* (2004) 34 Cal.4th 743, 785 [22 Cal.Rptr.3d 1, 101 P.3d 956].) The timing of Griffith's interview of defendant, a matter that *was* in evidence at trial, also supported the argument, as the prosecutor went on to observe after making the statement at issue. The essential point was thus properly supported without reference to the challenged statement, and that statement added little if anything to the argument. It is thus highly unlikely that the statement had any material impact on the jury's view of the case.

## D. *Evidentiary Arguments*

Defendant contests two rulings limiting psychologist Griffith's testimony.

### (1) *Hearsay Statement*

Defendant contends that the court erroneously sustained a hearsay objection to Griffith's testimony that defendant told a parole office psychologist, during the week after he was paroled, but before he robbed the bank, "that he felt lost [when] he was out [of prison]." Defendant's statement was offered as an example of behavior Griffith regarded as consistent with institutionalization. Defendant submits that his statement, recorded in a parole psychologist's report that Griffith reviewed, should have been admitted to show a basis for Griffith's opinion concerning his institutionalization.

■ Since an expert's opinion " 'is no better than the facts on which it is based' " (*People v. Gardeley* (1996) 14 Cal.4th 605, 618 [59 Cal.Rptr.2d 356, 927 P.2d 713]), experts should generally be allowed to testify to all facts upon which they base their opinions (*People v. Ainsworth* (1988) 45 Cal.3d

984, 1012 [248 Cal.Rptr. 568, 755 P.2d 1017]). " 'An expert may generally base his opinion on any "matter" known to him, including hearsay not otherwise admissible, which may "reasonably . . . be relied upon" for that purpose.' " (*People v. Carpenter* (1997) 15 Cal.4th 312, 403 [63 Cal.Rptr.2d 1, 935 P.2d 708]; see Evid. Code, § 801, subd. (b).) Although an opinion may be predicated on hearsay, the trial court has discretion to "exclude from the expert's testimony 'any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value.' " (*People v. Pollock* (2004) 32 Cal.4th 1153, 1172 [13 Cal.Rptr.3d 34, 89 P.3d 353].) " '[P]rejudice may arise if, " 'under the guise of reasons,' " the expert's detailed explanation " '[brings] before the jury incompetent hearsay evidence.' " ' " (*Carpenter, supra*, 15 Cal.4th at p. 403; see, e.g., *People v. Hughes* (2002) 27 Cal.4th 287, 338–339 [116 Cal.Rptr.2d 401, 39 P.3d 432] [no abuse of discretion to preclude expert from testifying to defendant's alleged hearsay statements to defense investigator, which were inconsistent with his statements to the police].)

The statement in question was neither irrelevant, incompetent, nor unreliable. The statement was relevant to the issue of defendant's alleged institutionalization, supportive of Griffith's opinion on the subject, made at a time when there was arguably no motive for fabrication, and reported by a reliable source—a psychologist at a parole outpatient clinic. Accordingly, we conclude that it was an abuse of discretion to prevent Griffith from testifying to his reliance on the statement.

The People contend that the statement was inadmissible under *People v. Campos* (1995) 32 Cal.App.4th 304 [38 Cal.Rptr.2d 113] (*Campos*). *Campos* was a mentally disordered offender (MDO) proceeding where the treating psychiatrist testified that she based her opinion that the defendant met the MDO criteria in part on reports of other professionals that were consistent with her conclusion. The opinion states:

"On direct examination, the expert witness may state the reasons for his or her opinion, and testify that reports prepared by other experts were a basis for that opinion. [Citation.] [¶] An expert witness may not, on direct examination, reveal the *content of reports prepared* or opinions expressed *by nontestifying experts.* ' " 'The reason for this is obvious. The opportunity of cross-examining the other doctors as to the basis for their opinion, etc., is denied the party as to whom the testimony is adverse.' " ' [Citations.] [¶] . . . [¶] . . . '[D]octors can testify as to the basis for their opinion [citation], but this is not intended to be a channel by which testifying doctors can place the opinion of innumerable out-of-court doctors before the jury.' " (*Campos, supra*, 32

Cal.App.4th at p. 308, italics added, quoting *Whitfield v. Roth* (1974) 10 Cal.3d 874, 894, 895 [112 Cal.Rptr. 540, 519 P.2d 588] (*Whitfield*).)

While the italicized language would suggest that no expert could ever refer during direct examination to the contents of another expert's report, we agree with defendant that *Campos* cannot be read for such a broad prohibition. *Campos* and *Whitfield* were concerned with preventing the introduction of multiple opinions, insulated from cross-examination, into evidence. Since this concern does not arise unless the expert is relying on other expert opinions, the reasoning of those cases is confined to that situation. This reading is reinforced by the discussion in *Mosesian v. Pennwalt* (1987) 191 Cal.App.3d 851 [236 Cal.Rptr. 778] (*Mosesian*),[2] another case on which *Campos* relied, where the expert's opinion was based in part on the opinions of others (*Mosesian, supra,* at p. 857). *Mosesian* distinguished *Williams v. Volkswagenwerk Aktiengesellschaft* (1986) 180 Cal.App.3d 1244 [226 Cal.Rptr. 306], finding that the expert there properly relied on another expert's test calculations because the opinion of the other expert was not solicited. (*Mosesian, supra,* at pp. 863–864.)

Here, Griffith was not relying on the parole psychologist's opinions concerning defendant, only on his notes of what defendant said during their interview. *Campos* is therefore distinguishable and does not preclude the admission of defendant's statement.

### (2) *Hypothetical Question*

The court also prevented Griffith from opining on a hypothetical question based on the facts of the case. During a recess before Griffith took the stand, defense counsel told the judge that he intended to ask Griffith "a hypothetical question based on certain facts . . . assume[d] to be true, to determine if he had an opinion as to the intent of the individual in the hypothetical." Counsel said that "the question would not be, did Mr. Bordelon have that specific intent. The question would be, assuming an individual in a certain circumstance were true, would you have an opinion as to the hypothetical." The court indicated that it was not inclined to permit the question counsel described, but that it was willing to entertain further discussion of the matter.

Counsel made a further record during jury deliberations, stating that "it was my intention to ask Dr. Griffith a hypothetical question based on the facts as presented in this particular case to determine whether or not he had an

---

[2] *Mosesian* was disapproved on another point in *People v. Ault* (2004) 33 Cal.4th 1250, 1272, footnote 15 [17 Cal.Rptr.3d 302, 95 P.3d 523].

opinion as to specific intent or conclusion on the mental state based on the hypothetical facts that I would propose to him. [¶] [I] would not be asking . . . directly regarding what his opinions were of Mr. Bordelon's mental state or specific intent. [¶] Instead, the question would be phrased as a hypothetical question. So he would not be asked to testify directly as to Mr. Bordelon but instead would only be required or permitted to give the opinion as to a hypothetical fact which I would ask him to assume would be true for the purposes of the question. I refrained from asking any such hypothetical questions based on the Court's indication to me off the record that it believe[d] that such questions would be prohibited by [Penal Code] Section 29." The court agreed with this description of the discussion and ruling.

Penal Code section 29 (hereafter section 29) provides: "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact." Rulings under this statute are reviewed for abuses of discretion. (*People v. San Nicolas* (2004) 34 Cal.4th 614, 663 [21 Cal.Rptr.3d 612, 101 P.3d 509].)

■■■ The court here could reasonably conclude that the hypothetical question counsel described would run afoul of section 29. Insofar as it appears from counsel's remarks, he was simply planning by means of the hypothetical to do indirectly what he could not do directly under the statute, namely, elicit an opinion from Griffith regarding defendant's specific intent in taking the money from the bank. While counsel referred to defendant's "mental state or specific intent," he never articulated any difference between the two concepts. To ask whether a hypothetical avatar in defendant's circumstances would have had the specific intent required for robbery, as counsel appeared to be proposing, would have been the functional equivalent of asking whether defendant himself had that intent. Section 29 "does not simply forbid the use of certain words, it prohibits an expert from offering an opinion on the ultimate question of whether the defendant had or did not have a particular mental state at the time he acted." (*People v. Nunn* (1996) 50 Cal.App.4th 1357, 1364 [58 Cal.Rptr.2d 294].)

■■■ Defendant maintains that a hypothetical question concerning the motive someone in his position would have had to take money from a bank would have been permissible under section 29, and that his trial counsel was

incompetent for failing to pursue such a question. We agree with defendant that a motive hypothetical would have been proper. Such a question would not have elicited an opinion as to his specific intent or implicate the rationale of section 29. "Motive describes the reason a person chooses to commit a crime. The reason, however, is different from a required mental state such as intent or malice." (*Hillhouse, supra,* 27 Cal.4th at p. 504; see *People v. Ward* (2005) 36 Cal.4th 186, 209 [30 Cal.Rptr.3d 464, 114 P.3d 717] ["experts did not render an impermissible opinion as to defendant's actual intent; rather, they properly testified as to defendant's motivations for his actions"].) Griffith would presumably have testified that defendant's behavior was consistent with someone with "institutionalization" who wanted to be returned to prison. It would have remained for the jury to draw the inference that, because he wanted to get back to prison, defendant did not intend to permanently or unreasonably deprive the bank of its money.

The People argue that counsel might have made a tactical decision not to explore defendant's motive with Griffith. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003 [108 Cal.Rptr.2d 291, 25 P.3d 519] (*Cunningham*) [where record sheds no light on why counsel failed to act, judgment will be affirmed on appeal " 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation' " for the omission].) However, it is apparent from counsel's objection to the motive instruction that he believed motive was an issue that helped the defense. Thus, it is likely that counsel would have proposed a proper motive hypothetical had he thought to do so.

Counsel developed the institutionalization defense, and we are reluctant to find that his representation " 'fell below an objective standard of reasonableness' " (*People v. Holt* (1997) 15 Cal.4th 619, 703 [63 Cal.Rptr.2d 782, 937 P.2d 213]) just because he may not have pursued that creative theory perfectly. But to put the evidentiary issue to rest, we will assume without deciding that counsel's performance may have been deficient, and turn to the critical question of prejudice.

(3) *Prejudice*

■ We cannot reverse for ineffective assistance of counsel unless it is reasonably probable that the verdict would have been different if a hypothetical question on motive had been asked. (See *Cunningham, supra,* 25 Cal.4th at p. 1003.) The same standard for prejudice applies to the exclusion of defendant's statement about his being lost before the robbery. (*People v. Benavides* (2005) 35 Cal.4th 69, 91 [24 Cal.Rptr.3d 507, 105 P.3d 1099]

["generally, violations of state evidentiary rules do not rise to the level of federal constitutional error"]; *People v. Fudge* (1994) 7 Cal.4th 1075, 1102 [31 Cal.Rptr.2d 321, 875 P.2d 36] [any error in sustaining hearsay objections was reviewable under *People v. Watson, supra,* 46 Cal.2d 818, standard; defendant was not prevented from presenting a defense, only some evidence concerning it]; *People v. Cudjo* (1993) 6 Cal.4th 585, 610 [25 Cal.Rptr.2d 390, 863 P.2d 635] [defense witness was erroneously prohibited from testifying, prejudice determined under *Watson* standard].)

Defendant was able to present a thorough institutionalization defense. "Institutionalization" was defined for the jury, and the defense expert opined that defendant exhibited behavior consistent with that syndrome. That behavior, according to the expert, included his expressions of anxiety about being paroled, and his inability to pull himself together and function after he was paroled. It is highly unlikely that cumulative evidence of institutional behavior in the form of his statement about being lost would have altered the jury's assessment of the case. The same is true of a hypothetical question about his motive. The reason the expert thought defendant took the money was plain from the rest of his testimony, and if there were any doubt on the score, it was dispelled at length by the forceful arguments of defense counsel. While those arguments were not equivalent to evidence, we do not believe from a review of the entire record that the failure to pose the hypothetical would have changed the outcome.

The question of prejudice must also be viewed in light of the inherent weaknesses of the institutionalization defense. To assert the defense is in some sense to contradict it: If defendant really wanted to be imprisoned, then why did he not plead guilty? A jury might find it easier to convict a person who, at one time at least, wanted to go to prison. Further, a desire to be incarcerated is not necessarily incompatible with an intent to commit the crime. While defendant may have been hoping to get caught, he also might have been content to keep the money—a win/win situation from his point of view. The jury could well have determined that defendant decided to accomplish the robbery and then let fate unfold. Indeed, there is no evidence that he ever planned voluntarily to give the money back. At the time of his arrest, he was fleeing with ill-gotten gains and showed no signs of intending to return the money.[3]

For these reasons, we conclude that the evidentiary errors identified here were harmless.

---

[3] We also note with respect to prejudice that the brief period of jury deliberation shows that the case was not a close one from the jury's point of view.

## III. DISPOSITION

The judgment is affirmed.

Swager, J., and Margulies, J., concurred.

A petition for a rehearing was denied on June 10, 2008, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied August 20, 2008, S164580.