Filed 6/6/24  P. v. Harris CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DOMINIQUE ISIAH HARRIS,<br><br>    Defendant and Appellant. | D083425<br><br><br>(Super. Ct. No. RIF2003279) |

APPEAL from a judgment of the Superior Court of Riverside County, Mark E. Johnson, Judge.  Affirmed.

Brad J. Poore, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Daniel J. Hilton, Deputy Attorneys General for Plaintiff and Respondent.

Dominique Isiah Harris was convicted on four counts:  (1) robbery (Pen. Code,[1] § 211) with a true finding that he personally used a firearm during the offense (§ 12022.53, subd. (b); count 1; (2) unlawful possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2; (3) unlawful possession of ammunition (§ 30305, subd. (a); count 3; and (4) unlawful possession of an assault weapon (§ 30605, subd (a)); count 4).  The conviction was based on a jury verdict for count 1, a plea of guilty for count 3, and a plea of no contest for counts 2 and 4.  The trial court sentenced Harris to a prison term of 13 years.

Harris contends that the robbery conviction should be reversed because insufficient evidence supports a finding that he used force or fear to accomplish the robbery.  He further contends that the conviction for unlawful possession of an assault weapon in violation of section 30605 should be reversed because that statute is facially unconstitutional under the Second Amendment to the United States Constitution.  He raises the constitutional challenge to section 30605 without having first obtained a certificate of probable cause (§ 1237.5), even though he pled no contest to that charge.

We conclude that (1) substantial evidence supports the robbery conviction; and (2) the challenge to section 30605 is not properly before us because Harris failed to seek a certificate of probable cause.  We accordingly affirm the judgment.

I.

FACTUAL AND PROCEDURAL BACKGROUND

In the early morning hours of September 16, 2020, Harris entered the convenience store area of a gas station and demanded that the cashier give

---

[1]    Unless otherwise indicated, all further statutory references are to the Penal Code.

him all the money from the cash register. Harris had a gun that he held by his side and showed to the cashier. After the cashier denied being able to open the register, Harris stated that the cashier had five seconds to open the register. The cashier then opened the register and gave Harris the money. As another employee approached, Harris took the money and left.

The gas station's surveillance video of the robbery was played for the jury at trial. The video depicts the interaction between Harris and the cashier, but it does not have any audio. Police used surveillance video from a business across the street, which showed the license plate of Harris's vehicle, to identify Harris and arrest him two days later. An Intratec TEC-9 assault firearm was found in Harris's vehicle, matching the type of firearm used during the robbery.

Harris was charged with one count of robbery (§ 211), with the further allegation that he personally used a firearm during the offense (§ 12022.53, subd. (b); count 1; (2) unlawful possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2; (3) unlawful possession of ammunition (§ 30305, subd. (a); count 3; and (4) unlawful possession of an assault weapon (§ 30605, subd (a)); count 4. Harris entered a plea of guilty to count 3, and a plea of no contest to counts 2 and 4. He proceeded to trial on the robbery alleged in count 1.

At trial, the cashier from the gas station was unable to testify because of a hospitalization. However, the jury was shown the video of the robbery and heard a recording of the cashier's 911 call, made immediately after the robbery.

The jury convicted Harris of robbery and made a true finding that he personally used a firearm in its commission. The trial court sentenced Harris to a prison term of 13 years.

3

## II.

## DISCUSSION

A.  *Harris's Challenge to the Sufficiency of the Evidence for the Robbery Conviction*

We first address Harris's challenge to the sufficiency of the evidence to support the robbery conviction.

" ' "In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves.  Rather, we 'examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'  [Citations.]  We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]  [¶]  The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations.  [Citation.]  '[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.'  [Citation.]  We do not reweigh evidence or reevaluate a witness's credibility." ' " (*People v. Ramirez* (2022) 13 Cal.5th 997, 1117–1118.)

The Penal Code defines robbery as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."  (§ 211.)  Accordingly, the jury was instructed with CALCRIM No. 1600 that it was required to find that "[t]he defendant used force or fear to take the property or to prevent the person from resisting."  As there was no evidence of any

4

force being applied during the robbery, the People proceeded at trial on the theory that Harris accomplished the robbery through fear.

The statutory definition of fear includes "[t]he fear of an unlawful injury to the person or property of the person robbed . . . ." (§ 212.) " ' "The element of fear for purposes of robbery is satisfied when there is sufficient fear to cause the victim to comply with the unlawful demand for [the victim's] property.' " [Citation] 'The extent of the victim's fear "do[es] not need to be extreme . . . ." ' [Citation] " '[T]he fear necessary for robbery is *subjective* in nature, requiring proof "that the victim was in fact afraid, and that such fear allowed the crime to be accomplished." ' (*People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1319 (*Bordelon*), italics added.) Although "[t]he victim's subjective fear may be proven . . . circumstantially, by 'infer[ring the victim's actual fear] from the circumstances in which the property [was] taken,' " the ultimate inquiry is "whether the victim . . . was *subjectively* in fear, not whether a hypothetical and objective 'reasonable person' standing in the victim's shoes would have been afraid." (*People v. Collins* (2021) 65 Cal.App.5th 333, 341.) " 'Actual fear . . . need not be testified to explicitly by the victim.' [Citation] ' " 'Where intimidation is relied upon, it [can] be established by proof of conduct, words, or circumstances reasonably calculated to produce fear.' " ' " (*Bordelon,* at p. 1319.)

Harris contends that because the cashier did not testify at trial, the jury was presented with insufficient evidence to find that that cashier was subjectively afraid during the robbery and complied with Harris's demand to hand over the money for that reason. Harris makes two separate arguments as to why, in the absence of the cashier's testimony, the evidence is insufficient to support a finding that the robbery was accomplished by fear. We consider each argument in turn.

5

1. *The Jury Could Reasonably Infer That the Cashier in the Video Was the Person Speaking In the 911 Call*

Harris's first argument focuses on the fact that the law enforcement officers who testified at trial used one name for the cashier, but on the 911 call, the cashier gave a different name. Specifically, the three officers who testified identified the cashier as "Mikala [A.],"[2] using female pronouns. However, during the 911 call, the person who called to report the robbery self-identified as "Elijah [A.]"[3] Harris argues that because of the two different first names, "the jurors . . . could not have known that the 911 call was made by the same person that they saw in the video." According to Harris, because the person in the 911 call used the name Elijah, not Mikala, "[i]t could have been a co-worker calling, a family member calling on the victim's behalf or even the victim in a different robbery," especially when "[t]he 911 caller purported to be an entirely different person of an entirely different sex." As we will explain, we reject the argument.

As an initial matter, we note that although the jury was not informed of the reason for the use of the two different names, the prosecutor discussed the issue with the trial court, explaining that the cashier was a transgender person, whose driver's license indicates the legal name "Mikala," but who now uses the name "Elijah." When it became apparent near the end of the trial that the cashier would not be available to testify to explain the use of the two different names, the prosecutor attempted to flag the issue for the

---

[2]    The officers used the cashier's full surname, but we have redacted it here to preserve the cashier's privacy.

[3]    The caller identified the full surname, which was the same surname referred to in the officers' testimony regarding the cashier. We have, again, redacted the full surname in the interest of privacy.

6

jury in two ways.  First, in questioning the custodian of records for the 911 call, the prosecutor referred to "a call from a Ms. [A.] or Mr. [A.]" and asked whether "the victim was male or female."  The witness responded, "I don't know."  Second, during closing argument, the prosecutor reminded the jury of how the 911 caller described the robbery, stating that "we heard those words from the victim, Mikala [A.].  Or as she referred to herself on the 911 call, Elijah."

We understand Harris's contention that the use of the two different names for the cashier might have caused confusion for the jury.  However, based on what was said in the 911 call, there was ample evidence for a reasonable juror to resolve that confusion by concluding that the cashier in the surveillance video during the robbery and the person speaking on the 911 call were the same person.

The surveillance video shows Harris approaching an employee with a gun, after which the employee opened the cash register and gave money to Harris.  A second employee then approached the register, and Harris left with the money.  In the 911 call, the caller described being the person who Harris approached with a gun and demanded money from, and who then complied with Harris's demand.  The 911 caller stated, "So, when I walked out, he said something to me and then told me to give him the money and I, I said, why, and that's when he showed me the gun[,] and I did.  He said to walk to the register and . . . give him the money . . ."  At another point, the caller told the 911 operator:  "Yes, well he lifted up his shirt showing me the gun and then, when I asked him, so he came in, he said give me all the money and I asked him why and then he showed me the gun.  And I tried to tell him that I didn't have the co[de] for the register, and he told [m]e would give me 5 seconds 'cause he knows I had a code.  Then, he grabbed the gun and then did

7

the same thing to my coworker when she walked in and told him he needed to leave."

The statements made in the 911 call support a reasonable inference that the person speaking on the 911 call is the same person shown in the video giving Harris the money out of the cash register. Accordingly, a reasonable juror could rely upon statements made during the 911 call in determining whether the cashier was afraid during the robbery.[4]

2. *Circumstantial Evidence Supports a Finding That the Cashier Was Subjectively Afraid*

Harris next argues that because the cashier did not testify, the evidence from the surveillance video and the 911 call were not, in themselves, enough to establish that the cashier was afraid during the robbery.

As we have explained, " '[a]ctual fear may be inferred from the circumstances, and need not be testified to explicitly by the victim.' " (*Bordelon*, *supra*, 162 Cal.App.4th at p. 1319.) Here, the cashier explained to the 911 operator that Harris displayed a gun and stated that the cashier would have five seconds to open the register. The cashier then opened the register. Based on those circumstances, a juror could reasonably infer that the cashier was afraid of being shot by Harris and for that reason opened the register and gave him the money.

Harris points out that, as described in the 911 call, the cashier initially stalled when Harris demanded money, asking "why" and claiming not to know the code to the cash register. According to Harris, this response showed the cashier was not afraid. However, as Harris also acknowledges,

---

[4]     Harris's contention that the jury could have concluded that the 911 call was from a different robbery is baseless. The 911 caller specifically identified the gas station at issue and provided a detailed physical description of the robber that matches Harris's unique appearance in the surveillance video.

8

when Harris *next* stated that the cashier had five seconds to comply, the cashier followed his directions. A reasonable inference from that course of events is that even if the cashier may not have been in fear at the *beginning* of the interaction, the cashier ended up handing over the money after becoming afraid due to the five-second deadline combined with the presence of the gun.

Harris also argues that instead of being motivated by fear, the cashier could have handed over the money because the gas station might have had a policy prohibiting employees from confronting thieves. Harris speculates that "it is possible that [the cashier] would have been reprimanded by [the cashier's] employer if [the cashier] declined to hand over the money." That argument fails because it is based on pure conjecture. No evidence at trial suggested that the gas station required cashiers to hand over money in a robbery. Indeed, the cashier's initial attempt to avoid handing over the money by claiming not to know the register code is inconsistent with the existence of such a policy.

Finally, Harris argues that the presence of a firearm during the robbery is insufficient to support an inference that the cashier was afraid because, according to Harris, "[t]here are many guns in this country, and the subjective fear of a victim is not established beyond a reasonable doubt by the mere sight of one." This argument ignores the full context in which the cashier saw the gun. Harris did not simply walk into the building while displaying a firearm. Instead, he displayed the firearm while making specific demands to open the cash register and hand over money, giving the cashier a deadline of five seconds to do so. Under those circumstances, a juror could reasonably infer that the cashier believed Harris was threatening to cause

9

physical harm with the firearm if the cashier did not act promptly to open the cash register and hand over the money.

In sum, we conclude that substantial evidence supports a finding that Harris accomplished the robbery by causing the cashier to experience fear.

B.     *The Challenge To the Constitutionality of Section 30605 Is Not Properly Before Us Because Harris Failed to Obtain a Certificate of Probable Cause*

In count 4, Harris pled no contest to a violation of section 30605, subdivision (a).  That statute provides, "Any person who, within this state, possesses any assault weapon, except as provided in this chapter, shall be punished by imprisonment in a county jail for a period not exceeding one year, or by imprisonment . . . ."  (§ 30605, subd. (a).)

For the first time on appeal, Harris contends that section 30605 is unconstitutional because it violates the Second Amendment to the United States Constitution, which states that "[a] well[-]regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  (U.S. Const., 2d. Amend.)  Specifically, Harris contends that we should apply the analytical framework set forth in *New York State Rifle & Pistol Association, Inc. v. Bruen* (2022) 597 U.S. 1 (*Bruen*) to conclude that section 30605 is facially unconstitutional.[5]  *Bruen*

---

[5]     Since *Bruen* was issued, one published Court of Appeal opinion has concluded that section 30605 does not violate the Second Amendment. (*People v. Bocanegra* (2023) 90 Cal.App.5th 1236, 1250 (*Bocanegra*).)  As Harris points out, however, a federal district court has concluded to the contrary.  (*Miller v. Bonta* (S.D. Cal. 2023), __ F.Supp.3d __, app. pending) ; but see *Rupp v. Bonta* (C.D. Cal., Mar. 15, 2024, No. 8:17-cv-00746-JLS-JDE) 2024 U.S.Dist. LEXIS 46430 [concluding that section 30605 does not violate the Second Amendment, and finding *Miller*'s analysis on that issue to be unpersuasive].)

was issued on June 23, 2022, which is three weeks *after* Harris pled no contest to violating section 30605 on June 2, 2022, but over eight months *before* the trial court sentenced Harris on March 10, 2023.

Section 1237.5 requires that a defendant who has entered a plea of no contest receive a certificate of probable cause from the trial court prior to appealing based on "reasonable constitutional, jurisdictional, or other grounds going to the legality of the proceedings." (§ 1237.5, subd. (a).) "Despite this broad language, . . . two types of issues may be raised on appeal following a guilty or [no contest] plea without the need for a certificate: issues relating to the validity of a search and seizure, for which an appeal is provided under section 1538.5, subdivision (m), and issues regarding proceedings held subsequent to the plea for the purpose of determining the degree of the crime and the penalty to be imposed." (*People v. Buttram* (2003) 30 Cal.4th 773, 780.) " 'It has long been established that issues going to the validity of a plea require compliance with section 1237.5.' " (*Id.* at p. 781.)

Here, in contending that it was unconstitutional for the trial court to have convicted him of violating section 30605 because the statute violates the Second Amendment, Harris is challenging the validity of his guilty plea. However, he did not obtain a certificate of probable cause. We asked the parties to provide supplemental briefing on whether Harris's challenge to the conviction in count 4 is not properly before us due to his failure to obtain a certificate of probable cause. (See Cal. Rules of Court, rule 8.304(b)(3) ["If the defendant does not file the written statement required by Penal Code section 1237.5 or the superior court denies a certificate of probable cause, the appeal will be limited to issues that do not require a certificate of probable cause."].)

Harris responded by relying on *People v. Stamps* (2020) 9 Cal.5th 685 (*Stamps*). Based on *Stamps*, Harris contends that he did not need a

11

certificate of probable cause because his appeal is based on *Bruen*, *supra*, 597 U.S. 1, which was issued after he pled no contest to count 4. As we will explain, the argument lacks merit.

In *Stamps*, the defendant's guilty plea included an admission to a serious felony conviction, with a corresponding five-year sentence enhancement under section 667, subd. (a). (*Stamps*, *supra*, 9 Cal.5th at p. 693.) While the defendant's appeal was pending, the Legislature enacted an ameliorative provision, giving trial courts the discretion to dismiss a serious felony enhancement. (*Ibid.*) Based on that change in law, the defendant sought a remand so the trial court could decide whether to exercise its discretion to dismiss the enhancement. (*Ibid.*) The defendant argued that no certificate of probable cause was required because he was not challenging the validity of the plea agreement, but rather was attempting to take advantage of " 'the general rule in California . . . that plea agreements are deemed to incorporate the reserve power of the state to amend the law or enact additional laws for the public good and in pursuance of public policy.' " (*Id.* at p. 695.) The case law on which the defendant relied stated that a plea agreement " 'does not have the effect of insulating [the parties] from changes in the law that the Legislature has intended to apply to them' [citations], and '[i]t follows . . . that requiring the parties' compliance with changes in the law made retroactive to them does not violate the terms of the plea agreement.' " (*Id.* at pp. 695–696.)

Our Supreme Court in *Stamps* agreed with the defendant's argument. It explained that the defendant's "appellate claim does not constitute an attack on the validity of his plea because the claim does not challenge his plea as defective when made." (*Stamps*, *supra*, 9 Cal.5th at p. 696.) *Stamps* stated, "[The defendant] does not seek to put aside or withdraw his plea. He

12

does not urge that his plea was invalid when made.  Instead, he seeks relief because the law subsequently changed to his potential benefit.  His appeal, then, does not attack the plea itself and does not require a certificate of probable cause." (*Id*. at p. 698.)

Harris contends that he, like the defendant in *Stamps*, was not required to obtain a certificate of probable cause because *Bruen*, *supra*, 597 U.S. 1, enacted a change in the law, to his benefit, after he entered his plea. Citing *Bruen*, Harris argues that "there was a substantial change in the controlling law that occurred three weeks *after* [he] pleaded, and that change has, arguably, rendered Penal Code section 30605 unconstitutional."  Harris states, "If the subsequent change in the law to *Stamps*'s *potential* benefit warranted an appeal without a certificate of probable cause, moreover, then *a fortiori* a subsequent change in the law that renders a defendant's plea and conviction unconstitutional under the United States Constitution must also be appealable without a certificate of probable cause. . . .  The plea was valid when it was made, but the subsequent change in the law has rendered the conviction unauthorized under the United States Constitution."

The argument fails because *Bruen*, *supra*, 597 U.S. 1 did not create an ameliorative change in law like the statutory amendment at issue in *Stamps*, *supra*, 9 Cal.5th 685.  The Supreme Court in *Bruen* was very clear that its opinion was not setting forth a new legal principle or creating any substantive rights under the Second Amendment, but instead was making "more explicit" the constitutional standard it endorsed in *District of Columbia v. Heller* (2008) 554 U.S. 570 but had been misconstrued by certain lower courts.  (*Bruen*, at p. 31.)  As our colleagues in the Third District persuasively explained, "the Supreme Court in *Bruen* did not create a new test applicable to Second Amendment challenges to firearm regulations.  Rather, the

Supreme Court in *Bruen* clarified the contours of *Heller*. In its own words, the majority in *Bruen* discussed the 'test that we set forth in *Heller* and apply today . . . .' (*Bruen, supra*, 597 U.S. at p. [26].) Similarly, turning to the application of the test to the matter before it, the *Bruen* majority stated: 'Having made the constitutional standard endorsed in *Heller* more explicit, we now apply that standard to New York's proper-cause requirement.' (*Id*. at p. [31].) Thus, the majority in *Bruen* made explicitly clear that it was applying the test it initially set forth in *Heller*." (*Bocanegra, supra*, 90 Cal.App.5th at p. 1255.)

Because *Bruen, supra*, 597 U.S. 1, did not set forth any new legal principle or create any new rights under the Second Amendment that could be described as ameliorative changes in the law, the holding of *Stamps, supra,* 9 Cal.5th at page 698, is not applicable here. Harris's appeal from the conviction in count 4 is not properly before us because he failed to obtain a certificate of probable cause.[6]

---

6     We note, as well, that *Stamps* is distinguishable because the change in law occurred while the defendant's appeal was pending, giving him no prior opportunity to seek the benefit of the change in law from the trial court and no opportunity to seek a certificate of probable cause prior to his appeal. (*Stamps, supra*, 9 Cal.5th at p. 693.)  Here, in contrast, *Bruen, supra,* 597 U.S. 1 was issued more than eight months before Harris was sentenced.  He accordingly had ample time to attempt to withdraw his guilty plea so as to argue that section 30605 was unconstitutional, or, at a minimum, to seek a certificate of probable cause to raise a challenge to the constitutionality of section 30605 on appeal.

## DISPOSITION

The judgment is affirmed.

IRION, Acting P. J.

WE CONCUR:


DO, J.


BUCHANAN, J.