Filed 4/5/16  P. v. Zanetti CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D069069 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FWV1200202) |
| ADRIAN ENRIQUE ZANETTI, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Jon D. Ferguson, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Nancy Olsen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler and Julie L. Garland, Assistant Attorneys General, Peter Quon, Jr., Randall D. Einhorn and Anthony Da Silva, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Adrian Enrique Zanetti of six counts of second degree robbery (Pen. Code,[1] § 211).  It found true as to all counts that Zanetti personally used a firearm (§ 12022.53, subd. (b)).  In separate proceedings, Zanetti admitted he suffered four prior strike convictions (§§ 1170.12, subds. (a)-(d), 667, subd. (b)) and two prior serious felony convictions (§ 667, subd. (a)(1)).

The trial court sentenced Zanetti under the "Three Strikes" law to a 225-years-to-life prison term as follows: 20 years plus 25 years to life for each count, with count 3 to be served concurrently with count 6.  As to each count, the court ordered Zanetti to pay, among other fines and fees, a $30 court security fee under section 1465.8, and a $30 criminal conviction fee under Government Code section 70373.

On appeal, Zanetti contends:  (1) his count 3 sentence must be stricken as he cannot be convicted of robbing the same victim twice in the same incident; alternatively, his count 3 sentence must be stayed under section 654; (2) insufficient evidence supports his count 2 conviction; (3) his sentence is cruel and unusual under the state and federal Constitutions; and (4) the abstract of judgment should be amended to reflect the oral pronouncement of judgment on count 4; as well as to correctly reflect the sentence imposed for his prior serious felony convictions.

Finding merit in Zanetti's first and fourth contentions, we will strike the count 3 conviction and otherwise affirm the judgment.  We remand the matter to the trial court with directions to amend the abstract of judgment as set forth below.

---

1      Statutory references are to the Penal Code unless otherwise stated.

2

*The Electronics Store Robbery* (*Count 2*)

On January 20, 2012, Jonathan Aguiar was working as a cashier at an electronics store while his manager, Malik Ahmed, filed paperwork in a back room. Zanetti entered the store wearing a black and gray sweatshirt with the hood pulled over his head. Aguiar briefly saw Zanetti's face. Zanetti told him not to look at him, and demanded money. Zanetti flashed a black, holstered handgun underneath his sweatshirt, and Aguiar put his hands up out of fear. Aguiar glanced at the lower half of Zanetti's face but Zanetti again told Aguiar not to look at him.

Aguiar opened the register and placed the money on the counter. After Zanetti took the money, he asked for electronic devices and directed Aguiar to the back room. Aguiar saw Zanetti pull the hood of his sweatshirt off his head. Zanetti asked Ahmed for money and electronic devices, but Ahmed informed him that all the money was in the cash register. Zanetti pushed Aguiar, ordered the men to stay in the back room, and left.

Later that day, Ahmed described the suspect to an Ontario Police officer based on his memory of the suspect's chin. Ahmed also relied on information Aguiar had relayed to him. Ahmed later identified Zanetti in a photographic lineup.

---

[2]     Zanetti robbed three separate businesses in Ontario, California. On January 19, 2012, he robbed a pharmacy using a semiautomatic handgun. Zanetti does not appeal his conviction on this count.

Aguiar, who felt nervous and scared soon after the incident, told police he was unable to identify the suspect because he did not get a good look at him. Aguiar identified Zanetti in a photographic lineup a couple of weeks later.

*The Fast Food Restaurant Robberies* (*Counts 3 through 6*)

On January 24, 2012, at approximately 8:20 p.m., Madeline Ramos was mopping the dining room area of a fast food restaurant while Diana Velez, another employee, was otherwise occupied. After seeing Zanetti open the door wearing a gray-hooded sweater, baseball-style gloves, and a clear plastic mask with red lips and black eyebrows, both employees screamed and ran to a back room. Zanetti followed them and said, "Stupid girls, why are you screaming? All I want is a sandwich." The restaurant manager, Harshil Lad, who had been in the freezer, offered to assist Zanetti at the front of the restaurant. Zanetti patted the right side of his waist. Zanetti unzipped his sweatshirt, displayed a black gun, and said, "I have a gun. All I want is money. I don't want to hurt anybody." Zanetti took Lad to join the female employees in the back room and told Lad to open a safe, but Lad replied the safe was broken. Zanetti asked Lad to turn off the surveillance system, but Lad said he could not do it. Zanetti reminded the employees he was armed and "didn't want to hurt" them. He took Lad's cell phone, saying, "I'm just taking it so you guys don't call the cops."

When Lad told him all the money was in the front register, Zanetti directed the employees there. Lad gave Zanetti a bag of money taken from the register, and Zanetti took the women's cell phones from the counter. Zanetti lead the employees to the back

4

room, ordering them to say there for five minutes. After a few minutes, Lad returned to the front of the store, verified that Zanetti had left, and called 911.

*Zanetti's Arrest*

Ontario Police Department officers arrived at the restaurant and took separate statements from the employees. Lad said he had installed a telephone application that could track his phone's location. Later that evening, officers tracked Lad's phone to Zanetti's residence and set up a perimeter around the residence. A police helicopter observed Zanetti smashing a cell phone, throwing the phone away, and returning to his residence. Officers detained Zanetti and found the women's cell phones and Lad's phone case. Officers recovered from Zanetti's residence a wallet containing $190, a black-gray reversible sweater, baseball-style gloves, and a mask. Ramos, Velez, and Lad separately identified Zanetti in in-field identifications. Ramos identified the mask that Zanetti had worn.

DISCUSSION

I.

*Count 3 Must Be Stricken Because Zanetti Only Committed a Single Robbery of Lad*

Count 3 arises from the robbery of Lad's phone, and count 6 from the robbery of Lad as an "employee of [the restaurant]," as alleged in the information. Zanetti contends insufficient evidence supports his count 3 conviction as he did not commit counts 3 and 6 "with a separate intent and plan"; instead, he committed only one robbery in a "continuous course of conduct with a single objective."

5

A.  *Background*

On April 17, 2014, defense counsel moved under section 995 to set aside either the count 3 or count 6 charge.[3]  The court stated, "It might be a sentencing issue down the road, but it's not a [section] 995 issue," and denied the motion:  "I think what saves [both counts] is the gap in time."

Zanetti later moved for a judgment of acquittal under section 1118.1 on all the charges and enhancements.  The trial court denied the motion.

At sentencing, defense counsel argued section 654 should apply because the six counts were actually "three separate instances."  The court declined to impose consecutive sentences on both counts:  "[I]t was still a continuous course of conduct.  It was indivisible in time, the taking, that was the same application—sustained application of fear that made the crime of robbery that the victim was still undergoing at the time the second taking occurred, so in the Court's view, it would be inappropriate to run those counts consecutive."  The court did not stay the count 3 sentence under section 654.

B.  *Legal Principles*

Well settled standards apply to Zanetti's substantial evidence challenge.  " 'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves.  Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the

---

3       The first amended information listed the robberies of Lad as counts 4 and 10.

6

defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. [Citation.] "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.] We do not reweigh evidence or reevaluate a witness's credibility.' [Citations.] 'Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.' " (*People v. Brown* (2014) 59 Cal.4th 86, 105-106.)

A person may be convicted of more than one crime arising out of the same act or course of conduct. (§ 954; *People v. Reed* (2006) 38 Cal.4th 1224, 1226.) However, "[a] single crime cannot be fragmented into more than one offense." (*People v. Rouser* (1997) 59 Cal.App.4th 1065, 1073.)

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) "[T]he crime of robbery consists of larceny plus two aggravating circumstances: (1) the property is taken from the person or presence of another; and (2) the taking is accomplished by the use of force or by putting the victim in fear of injury." (*People v. Gomez* (2008) 43 Cal.4th 249, 254, fn. 2.) "[W]hen a defendant steals by force

7

or fear more than one item during the course of an indivisible transaction involving a single victim, he commits only one robbery notwithstanding the number of items he steals." (*People v. Marquez* (2000) 78 Cal.App.4th 1302, 1304.) A defendant commits only one robbery no matter how many items he steals from a single victim pursuant to a single plan or intent. (*People v. Ortega* (1998) 19 Cal.4th 686, 699 (*Ortega*), overruled on other grounds in *People v. Reed*, *supra*, 38 Cal.4th at pp. 1228-1232; see also *People v. Packard* (1982) 131 Cal.App.3d 622, 626 [multiple robbery convictions based on the taking of multiple items may be sustained only "if each taking is the result of a separate independent impulse or intent"].)

In *Ortega*, *supra*, 19 Cal.4th at p. 690, four defendants exited their car, surrounded a parked van, approached the driver and the passenger, and assaulted the driver. As the driver complied with one defendant's demand for his wallet, the defendant saw his pager. (*Id.* at pp. 690-691.) One defendant threw the wallet back to the driver but kept the driver's pager. (*Id.* at p. 691.) Meanwhile, another defendant beat the passenger and pulled off the passenger's sweater after the passenger exited the van. (*Ibid.*) The defendants responsible for the beatings entered the van and drove away, closely followed by the other defendants. (*Ibid.*) The defendants were convicted of two counts of carjacking based on taking the van from the possession of the driver and passenger; two counts of robbery, based on the forcible theft of the driver's wallet and pager and the passenger's sweater; and one count of grand theft of a vehicle. (*Ortega*, *supra*, 19 Cal.4th at pp. 690-691.) Count 3 had alleged the defendants robbed the driver's personal

8

property, and count 5 had alleged the defendants committed grand theft of the driver's van. (*Id.* at p. 699.)

The California Supreme Court held the defendants were improperly convicted of robbery of the vehicle and grand theft of the vehicle: "[T]he property taken in the robbery of [the driver], charged in count 3, included the van. 'When a defendant steals multiple items during the course of an indivisible transaction involving a single victim, he commits only one robbery or theft notwithstanding the number of items he steals.' " (*Ortega*, *supra*, 19 Cal.4th at p. 699, citing *People v. Brito* (1991) 232 Cal.App.3d 316, 326, fn. 8; see also *People v. Irvin* (1991) 230 Cal.App.3d 180, 185 [a robber cannot be charged with and convicted of a separate robbery or an additional theft offense because "he or she took more than one item from a solitary victim during a single course of conduct"].)

In *People v. Marquez*, *supra*, 78 Cal.App.4th 1302, the defendant was convicted of two separate robberies arising from an incident in a restaurant. (*Id.* at pp. 1304-1305.) The appellate court characterized the defendant's actions as an "indivisible transaction." (*Id*. at pp. 1304, 1307.) "In one seamless ill-conceived effort, defendant walked up to the counter at Lyon's restaurant, threatened [the waitress] with a handgun, thereby convincing her to hand over her tips lying on the counter and Lyon's operating money from the cash drawer. This was an indivisible transaction involving a single victim who was forced to relinquish possession of two separately owned amounts of money at the same place and at the same time." (*Id.* at p. 1307.)

9

The *Marquez* court held that substantial evidence did not support the defendant's two separate robbery convictions because the defendant committed only one robbery "notwithstanding the number and ownership of the items he steals." (*People v. Marquez, supra*, 78 Cal.App.4th at p. 1304.) "Since the central element of robbery is force or fear, a defendant may be convicted of a separate robbery for each victim of such force or fear, even if the victims are in joint possession of the property taken. [Citations.] Here, in contrast, the defendant committed only one larceny against a single victim involving one threatened application of force and occurring at the same place and time. In these circumstances the single larceny can only support a single count of robbery." (*Marquez*, at p. 1308, fn. omitted.)

C. *Analysis*

The law set forth in *Ortega, supra*, 19 Cal.4th 686 and *Marquez, supra,* 78 Cal.App.4th 1302, applies here. Zanetti took Lad's phone in the back room of the restaurant, and soon afterwards ordered the employees to the front of the restaurant and took the money Lad collected from the register. As the trial court concluded in sentencing Zanetti concurrently on counts 3 and 6, these acts were committed in one indivisible transaction. In fact, Zanetti's stated purpose in taking Lad's phone was to prevent Lad from calling the police before Zanetti could complete the robbery. Therefore, Zanetti committed only one robbery against Lad, starting with Lad's phone and continuing with the register money. The robbery did not end until Zanetti had left the restaurant with the property. (*People v. Hodges* (2013) 213 Cal.App.4th 531, 540; *People v. Brito, supra*, 232 Cal.App.3d at p. 326, fn. 8.) That the phone belonged to Lad

10

and the money belonged to the restaurant did not make this two robberies.  As in *Marquez*, where the robber took the employee's tips and the restaurant's earnings, this was one indivisible robbery of the same victim.

In light of the above, we shall strike Zanetti's conviction on count 3, as well as the criminal assessment fee and the court security fee, and direct the trial court to amend the abstract to reflect that modification.  Our resolution of this issue renders Zanetti's arguments concerning section 654 moot.

## II.

*Sufficient Evidence Supports Zanetti's Count 2 Conviction*

Zanetti contends insufficient evidence supports his count 2 conviction because Aguiar's eyewitness identification was inconsistent and unreliable, and Ahmed based his description in part on information that Aguiar had relayed to him.

A.  *Background*

Aguiar testified that during the robbery he briefly glanced at Zanetti's face and saw Zanetti remove his hood in the back room.  Aguiar described the robber as "five-seven, Hispanic, kind of medium-build" male with facial hair and a receding hairline.  Aguiar told police on the night of the robbery that he could not identify the robber and did not tell the police he saw Zanetti without his hood; however, he testified that he was nervous and scared when he talked to the police.  Aguiar nonetheless identified Zanetti in a photographic lineup.  He also identified a nylon holster found in Zanetti's residence.  At trial, Aguiar reviewed photographs of the gun found in Zanetti's home and concluded it

11

was the gun used in the robbery. Aguiar identified Zanetti at the preliminary hearing and at trial. During Aguiar's testimony, the jury saw surveillance footage of the robbery.

Ahmed testified that during the robbery he had difficulty seeing Zanetti's face apart from his chin, but described Zanetti to the police as a "Hispanic male, between 30 and 35 years with a medium build and a mustache" based on his memory of Zanetti's chin and information Aguiar gave him. Although Ahmed told a police detective he only saw Zanetti briefly and partially, Ahmed identified Zanetti during the photographic lineup based on Zanetti's "pointy" chin that lacked a dimple. Ahmed was not "100 percent confident" because he selected Zanetti's photograph by process of elimination; however, he testified that Zanetti's photograph most resembled the suspect. Ahmed was "absolutely positive" Zanetti did not remove his hood, and he could not identify Zanetti at trial.

Defense expert research psychologist Kathy Pezdek testified about the accuracy of eyewitness memory and identification, identifying various factors affecting eyewitness identification: the length of time the eyewitness looked at the suspect's face, the tendency for an eyewitness to focus his or her attention on the suspect's weapon, the eyewitness's stress level, and the suspect's use of a disguise.

B. *Legal Principles*

As we have explained, when sufficiency of the evidence is challenged on appeal, our role in reviewing the evidence is limited. We do not reweigh the evidence and substitute our judgment for that of the jury. (*People v. Escobar* (1996) 45 Cal.App.4th 477, 481.) Instead, we determine whether any rational trier of fact could find the

defendant guilty beyond a reasonable doubt. (*People v. Jones* (1990) 51 Cal.3d 294, 314.) This court's authority begins and ends with a determination of whether any substantial evidence, disputed or not, supports the verdict; thus, when the record discloses substantial evidence—that is reasonable, credible and of solid value—we accord due deference to the trier of fact. (*Id.* at p. 314.) " '[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.] '[I]t is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt.' " (*People v. Lewis* (2009) 46 Cal.4th 1255, 1289-1290, fn. omitted.)

A single eyewitness's identification of a suspect as the perpetrator of a crime is sufficient to sustain a conviction. (*People v. Boyer* (2006) 38 Cal.4th 412, 480.) "Moreover, a testifying witness's out-of-court identification is probative for that purpose and can, by itself, be sufficient evidence of the defendant's guilt even if the witness does not confirm it in court." (*Ibid.*) "The strength or weakness of the identification . . . and the qualification of identity and lack of positiveness in testimony are matters which go to the weight of the evidence and the credibility of the witnesses, and are for the observation and consideration, and directed solely to the attention of the jury in the first instance[.]" (*People v. Lindsay* (1964) 227 Cal.App.2d 482, 494.)

In discussing an out-of-court identification, the California Supreme Court in *People v. Boyer*, *supra*, 38 Cal.4th at p. 481, noted that the defendant's counsel had a full opportunity to cross-examine the witness about the certainty of her photo identification

and about all aspects of the identification process, which included occasions in which she identified others as the perpetrator. The court concluded that under these circumstances, it was for the jury to evaluate the credibility of the witness's identification and the weight her testimony deserved. (*Ibid.*)

In *People v. Mohamed* (2011) 201 Cal.App.4th 515, the prosecution introduced the testimony and curbside identifications of a robbery victim and an eyewitness to a restaurant robbery. (*Id.* at pp. 517-518.) The victim said that the defendant wore a mask in a way that left the bottom of his face visible, allowing her to see the shape of his jawline, nose, and mouth. (*Id.* at pp. 517-518.) During her curbside identification of the suspect, the victim told the police she was "80 percent sure" the defendant was the robber based on his clothing, facial features, and build. (*Id.* at p. 519.) She also identified the defendant at the preliminary hearing and at trial. (*Id.* at pp. 519, 521.) The witness at the restaurant based his curbside identification on the defendant's clothes, and despite some doubt, he was confident about his identification. (*Id.* at p. 519.) Both the victim and the witness missed details about the defendant's outfit and possessions, but their description of the defendant's physical appearance closely matched. (*Id.* at pp. 518-519, 522.) At trial, defense counsel introduced expert testimony on variables affecting eyewitness identification. (*Id.* at p. 520.) This court held sufficient evidence supported the defendant's conviction despite the victim's uncertainty or the fact that neither the victim nor the witness saw the defendant's entire face. (*Id.* at p. 522.) Additionally, the discrepancies between the witnesses' observations and their omission of certain information from their initial descriptions of the defendant "did not necessitate the jury's

14

rejection of their identifications." (*Ibid.*) Finally, the jury was not obligated to accept the expert witness's testimony or find it applicable to the case. (*Ibid.*)

Defense counsel cross-examined Aguiar about his statement to the police, whether Zanetti removed the hood of his sweatshirt, and Aguiar's identification of Zanetti at the photographic lineup. The jury was entitled to believe Aguiar's testimony that he saw Zanetti's facial hair and receding hairline when he glanced at Zanetti or saw Zanetti remove the hood of his sweatshirt. (See *People v. Boyer*, *supra*, 38 Cal.4th at p. 481.) Because Ahmed based part of his description of the suspect on what Aguiar told him, the jury in evaluating Ahmed's testimony could reasonably conclude Aguiar's testimony was credible.

Even if the jury concluded Aguiar mistakenly believed Zanetti removed his hood and neither employee clearly saw Zanetti's face, substantial evidence supports the conviction. (*People v. Mohamed*, *supra*, 201 Cal.App.4th at p. 522 [the fact that witnesses did not see the suspect's face "does not preclude the existence of sufficient support for the jury's verdict"].) Ahmed testified on his observation of Zanetti's "pointy" chin as a basis for identifying Zanetti at the photographic lineup. The fact Ahmed was not "100 percent" certain of his identification alone does not preclude a conclusion that sufficient evidence supported the conviction. (*People v. Mohamed*, *supra*, 201 Cal.App.4th at p. 522.) Moreover, the surveillance footage corroborated Aguiar's recollection of the robbery and description of the suspect. The handgun and holster were recovered from Zanetti's home. Both employees identified Zanetti in photographic lineups, and Aguiar identified Zanetti at the preliminary hearing and at trial.

15

The jury was entitled to reject Dr. Pezdek's testimony based on its instruction with CALCRIM No. 332: "Witnesses were allowed to testify as experts and to give opinions. You must consider the opinions, but you are not required to accept them as true or correct. The meaning and importance of any opinion are for you to decide." Under all the circumstances, we conclude substantial evidence supports Zanetti's count 2 conviction.

III.

*Zanetti's Sentence Is Not Cruel and Unusual*

Zanetti contends his 225 years-to-life sentence is functionally equivalent to life in prison without parole because he will be unable to serve his sentence within his natural life expectancy; therefore, it is cruel and unusual punishment under the state and federal Constitutions. He argues the 2012 robberies did not involve homicide or physical injury but were motivated by his drug addiction.

A. *Background*

Zanetti admitted that in June 1990, he suffered strike convictions for second degree robbery, assault with a firearm (§ 245, subd. (a)(2)), and firing at an inhabited dwelling (§ 246). Zanetti also admitted that in 2004, he suffered a strike or serious felony conviction for first degree residential burglary. (§ 459.) The trial court denied Zanetti's motion to strike certain strike priors under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497. At sentencing, the People stated Zanetti violated parole in 2007 by selling narcotics. Zanetti was also deported from the United States three times, and defense

16

counsel asserted Zanetti re-entered the country each time to address his drug addiction and provide for his family. Zanetti was 45 years old when he was sentenced in this case.

B. *Legal Principles*

The People argue Zanetti forfeited this contention by failing to raise it at the sentencing hearing. (*People v. Russell* (2010) 187 Cal.App.4th 981, 993.) We address the merits. (*People v. Norman* (2003) 109 Cal.App.4th 221, 230 ["Nonetheless, we shall reach the merits under the relevant constitutional standards, in the interest of judicial economy to prevent the inevitable ineffectiveness-of-counsel claim"]; see also *People v. Martinez* (1999) 76 Cal.App.4th 489, 496.) We review de novo whether punishment is cruel and unusual, viewing the underlying facts in the light most favorable to the judgment. (*People v. Mantanez* (2002) 98 Cal.App.4th 354, 358.)

The Eighth Amendment's ban on cruel and unusual punishment prohibits imposition of a sentence that is grossly disproportionate to the severity of the crime. (*Ewing v. California* (2003) 538 U.S. 11, 20-21 (*Ewing*).) In *Graham v. Florida* (2010) 560 U.S. 48, the United States Supreme Court recognized that punishment prohibited as unconstitutionally disproportionate to the offense generally fall into two classifications: those which are categorically prohibited, and those which are prohibited based on the facts of a particular case. (*Id.* at p. 59.)

To determine whether a particular sentence is so grossly disproportionate that it violates the federal Constitution, the court considers all the circumstances of the case, including the gravity of the offense and the severity of the penalty as well as whether more serious crimes are subject to the same penalty in other jurisdictions. (*Solem v.*

17

*Helm* (1983) 463 U.S. 277, 292.) No single criterion is dispositive. (*Id.* at p. 291, fn. 17.) " '[[O]utside] the context of capital punishment, *successful* challenges to the proportionality of particular sentences [will be] exceedingly rare.' " (*Id.* at p. 290, quoting *Rummel v. Estelle* (1980) 445 U.S. 263, 272.) Still, although deference is given to the Legislature's prescribed sentence for a particular crime (*Solem v. Helm*, at p. 290), no penalty is per se constitutional. (*Ibid.*)

When punishment is imposed under the Three Strikes scheme, the defendant is not being punished merely for the most recent offense, but also for recidivism. (*People v. Mantanez*, *supra*, 98 Cal.App.4th at p. 366.) Thus, extended punishment under the Three Strikes law can justifiably be imposed on defendants who repeatedly commit felonies without running afoul of the constitutional proscription against cruel and unusual punishment. (*Ewing*, *supra*, 538 U.S. at pp. 29-30; see *Lockyer v. Andrade* (2003) 538 U.S. 63, 70-77.) However, a defendant may prevail on a cruel and unusual punishment challenge if the "current offense bears little indication [the defendant] has recidivist tendencies to commit offenses that pose a risk of harm to the public." (*People v. Carmony* (2005) 127 Cal.App.4th 1066, 1080; see *In re Coley* (2012) 55 Cal.4th 524, 562.)

Similarly, under state law Zanetti must overcome a "considerable burden" in challenging his penalty as cruel or unusual. (*People v. Wingo* (1975) 14 Cal.3d 169, 174.) He must demonstrate the punishment is so disproportionate to the crime for which it was imposed it "shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424 (*Lynch*); accord, *People v. Dillon* (1983)

18

34 Cal.3d 441, 478, disapproved on other grounds in *People v. Chun* (2009) 45 Cal.4th 1172, 1185-1186.) The *Lynch* court identified three factors for the reviewing court to consider in assessing this constitutional claim: (1) the nature of the offense and the offender; (2) how the punishment compares with punishments for more serious crimes in the jurisdiction; and (3) how the punishment compares with the punishment for the same offense in other jurisdictions. (*Lynch*, *supra*, 8 Cal.3d at pp. 425-427.)

To evaluate whether a particular punishment is cruel or unusual, courts examine the nature of the offense and of the offender, " 'with particular regard to the degree of danger both present to society.' " (*People v. Dillon*, *supra*, 34 Cal.3d at p. 479.) In assessing the nature of the offense, a court should consider the circumstance of the particular offense such as the defendant's motive, the way the crime was committed, the extent of his involvement, and the consequences of his acts. (*Ibid*.) In analyzing the nature of the offender, a court should consider his "age, prior criminality, personal characteristics, and state of mind." (*Ibid.*) "[A] punishment which is not disproportionate in the abstract is nevertheless constitutionally impermissible if it is disproportionate to the defendant's individual culpability." (*Id.* at p. 480.) In addition to the nature of the current offense, "recidivism is a legitimate factor to consider when imposing a greater sentence than for a first time offense." (*People v. Cuevas* (2001) 89 Cal.App.4th 689, 704.) "Recidivism in the commission of multiple felonies poses a danger to society justifying the imposition of longer sentences for subsequent offenses." (*People v. Cooper* (1996) 43 Cal.App.4th 815, 823-824.)

In *Ewing*, *supra*, 538 U.S. at pages 18, 20, the United States Supreme Court affirmed the defendant's to 25-years-to-life sentence under California's Three Strikes law for stealing three golf clubs, as a grand theft with a prior theft conviction. His criminal history included theft-based convictions, battery, burglary, possessing drug paraphernalia, appropriating lost property, possessing a firearm, and trespassing. (*Id.* at p. 18.) In rejecting the defendant's cruel and unusual punishment challenge, Justice O'Connor, writing for a plurality, found the sentence was "not grossly disproportionate" (*id.* at p. 30), stating: "In weighing the gravity of Ewing's offense, we must place on the scales not only his current felony, but also his long history of felony recidivism. Any other approach would fail to accord proper deference to the policy judgments that find expression in the legislature's choice of sanctions. . . . To give full effect to the State's choice of this legitimate penological goal, our proportionality review of Ewing's sentence must take that goal into account." (*Id.* at p. 29.)

In *Lockyear v. Andrade* (2003) 538 U.S. 63, 66, the defendant stole five videotapes worth $84.70 from a store and, two weeks later, stole four videotapes worth $68.84 from another store. He was convicted of two counts of petty theft with a prior conviction, and sentenced under the Three Strikes law to two consecutive 25-year-to-life terms. (*Id.* at pp. 67-68.) His criminal history consisted primarily of theft, burglary and drug convictions. (*Id.* at pp. 66-67.) After a California appellate court held the sentence did not violate the Eighth Amendment, the United States Supreme Court held the defendant was not entitled to federal habeas relief because the California court's application of the "gross disproportionality principle" was not unreasonable. (*Lockyear*,

20

*supra*, at p. 77.) The court stated that the gross disproportionality rule "reserves a constitutional violation for only the extraordinary case." (*Ibid.*)

C. *Analysis*

Zanetti's sentence is not cruel and unusual under the federal Constitution because it was properly based on his recidivist conduct. The Three Strikes law was "devised for the 'revolving door' career criminal, and was expressly intended 'to ensure longer prison sentences' " for individuals who commit qualifying second and third strikes. (*People v. Strong* (2001) 87 Cal.App.4th 328, 331-332, fn. omitted; *People v. Gaston* (1999) 74 Cal.App.4th 310, 320.) When Zanetti was convicted of first degree residential burglary in 2004, he had already suffered prior strike convictions, including a second degree robbery conviction, but he avoided sentencing under the Three Strikes law. Nevertheless, Zanetti continued his criminal behavior by violating parole three years later. His present conviction for six counts of second degree robbery is the second case in which he has been convicted of that offense. Similarly, his prior serious conviction for assault with a firearm did not prevent him from using a firearm in the 2012 robberies. We therefore conclude application of the Three Strikes law is proper here. (See, e.g., *People v. Romero* (2002) 99 Cal.App.4th 1418, 1433 [" ' "Because the Legislature may constitutionally enact statutes imposing more severe punishment for habitual criminals, it is illogical to compare [defendant's] punishment for his 'offense,' which includes his recidivist behavior, to the punishment of others who have committed more serious crimes, but have not qualified as repeat felons." ' "].)

Zanetti's sentence is not grossly disproportionate in relation to the nature and gravity of the offenses. In a six-day crime spree, Zanetti robbed three businesses and multiple victims, each time threatening the victims with a firearm. Zanetti wore different clothes and concealed his face, indicating planning and sophistication. That Zanetti did not physically injure the victims is not dispositive because robbery is an inherently violent and serious felony. (§§ 667, subd. (d)(1), 667.5, subd. (c)(9); see also *People v. Brito*, *supra*, 232 Cal.App.3d at p. 321; *People v. Terrill* (1979) 98 Cal.App.3d 291, 305 [armed robbery is an inherently dangerous felony for the purposes of the felony murder rule].)

Zanetti's history of drug addiction does not make his sentence grossly disproportionate. "[D]rug addiction is not necessarily regarded as a mitigating factor when a criminal defendant has a long-term problem and seems unwilling to pursue treatment." (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1511.) "As a policy matter, when a defendant has a drug addiction or substance abuse problem, where the defendant has failed to deal with the problem despite repeated opportunities, where the defendant shows little or no motivation to change his life style, and where the substance abuse problem is a substantial factor in the commission of crimes, the need to protect the public from further crimes by that individual suggests that a longer sentence should be imposed, not a shorter sentence." (*People v. Reyes* (1987) 195 Cal.App.3d 957, 963.) Here, in light of Zanetti's continued drug use and criminal acts spanning many years when he was not in prison, the trial court was entitled to regard as self-serving Zanetti's

22

claims that he reentered the United States to seek treatment and took his drug treatment seriously.

We reach the same conclusion under the California Constitution. (Cal. Const., art. I, § 17.) Although some courts have interpreted the state and federal Constitutions' provisions slightly differently, the analysis is materially similar. (See *People v. Mantanez*, *supra*, 98 Cal.App.4th at p. 358, fn. 7; see also *People v. Cunningham* (2015) 61 Cal.4th 609, 670-671; *People v. Cole* (2004) 33 Cal.4th 1158, 1235.) Both Constitutions bar punishment that is "grossly disproportionate" to the crime or the individual culpability of the defendant. (*Solem v. Helm*, *supra*, 463 U.S. at p. 288; *People v. Dillon*, *supra*, 34 Cal.3d at p. 450, 478, fn. 25.) Under both constitutional prohibitions, the court considers the nature of the offense and the defendant, the punishment for more serious offenses within the jurisdiction, and the punishment for similar offenses in other jurisdictions. (*Solem v. Helm*, *supra*, 463 U.S. at pp. 290-291; *Lynch*, *supra*, 8 Cal.3d at pp. 425, 431, 436.) For the reasons discussed above, Zanetti has failed to meet his burden of establishing that his punishment was cruel and/or unusual. (*People v. King* (1993) 16 Cal.App.4th 567, 572.) We conclude that, under either the state or federal Constitutions, Zanetti's 225-years-to-life sentence was not "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*Lynch*, *supra*, 8 Cal.3d at p. 424.)

IV.

*The Abstract of Judgment Must Be Amended*

The trial court sentenced Zanetti on count 4 to a consecutive term of 20 years plus 25 years to life, but the sentencing minute order and the abstract of judgment reflect a sentence of 20 years *and two months* plus 25 years to life. The 20-year determinate sentences on each count consisted of a 10-year term for the firearm use enhancement under section 12022.53, subdivision (b), and two five-year consecutive terms for Zanetti's two prior serious felony convictions under section 667, subdivision (a). However, the sentencing minute order and abstract of judgment do not reflect the correct breakdown of the sentence regarding the prior serious felony convictions.

Zanetti contends the sentencing minute order and abstract of judgment should be amended to reflect the oral pronouncement of judgment. The People concede the point, and we agree. The abstract of judgment is not itself the judgment of conviction, and cannot prevail over the court's oral pronouncement of judgment to the extent the two conflict. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

DISPOSITION

We strike Adrian Enrique Zanetti's conviction on count 3 and the fees imposed on that count.  In all other respects we affirm the judgment.  We direct the trial court to amend the abstract of judgment to reflect those changes and the fact that the sentence imposed on count 4 is 20 years plus 25 years to life, and that two five-year consecutive sentences for two prior serious felony convictions under Penal Code section 667, subdivision (a) are to be served on each count.  The trial court shall forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

O'ROURKE, J.

WE CONCUR:

BENKE, Acting P. J.

McDONALD, J.

25